THE STATE OF OHIO, APPELLEE, *v.* WHITE, APPELLANT.

[Cite as *State v. White,* 118 Ohio St.3d 12, 2008-Ohio-1623.]

(No. 2006–0295—Submitted May 1, 2007—Decided April 9, 2008.)

CUPP, J.

{¶ 1} This appeal involves a claim by petitioner-appellant, Clifton White III, that he is mentally retarded and therefore constitutionally ineligible for the death penalty.

{¶ 2} In 1995, White broke up with his girlfriend, Heather Kawczk. Weeks later, White killed Kawczk's mother and Deborah Thorpe, who was the mother of Kawczk's new boyfriend, Michael Thorpe. During a subsequent confrontation at Kawczk's place of employment, White attempted to kill Michael Thorpe. See *State v. White* (1999), 85 Ohio St.3d 433, 433–434, 709 N.E.2d 140.

{¶ 3} White was sentenced to death for the aggravated murder of Deborah Thorpe. On direct appeal, we affirmed his conviction and death sentence. Id. The trial court dismissed White's initial petition for postconviction relief in March 1998, and the court of appeals affirmed. *State v. White* (June 16, 1999), Summit App. No. 19040, 1999 WL 394938.[1]

{¶ 4} On June 20, 2002, the United States Supreme Court held that the Eighth Amendment prohibits sentencing to death persons who are mentally retarded. *Atkins v. Virginia* (2002), 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335. On July 22, 2002, White commenced the instant litigation by filing a successor petition for postconviction relief.[2] In that petition, White asserted that he was mentally retarded and hence, under *Atkins,* could not be executed.

## I. The Legal Definition of Mental Retardation

{¶ 5} In *Atkins,* 536 U.S. at 308, 122 S.Ct. 2242, 153 L.Ed.2d 335, fn. 3, the United States Supreme Court quoted the definitions of mental retardation promulgated by the American Association on Mental Retardation ("AAMR") and the American Psychiatric Association ("APA").

{¶ 6} The AAMR defines mental retardation as " 'substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the

---

1. On January 6, 2004, the United States Court of Appeals for the Sixth Circuit held White's federal habeas corpus appeal in abeyance pending resolution of his mental-retardation claim in state court.

2. The state postconviction procedure, R.C. 2953.21 et seq., is the proper vehicle for the assertion of an *Atkins* claim by a person sentenced to death on or before December 11, 2002. *State v. Lott,* 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, ¶ 13.

14

following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.' " *Atkins,* 536 U.S. at 308, 122 S.Ct. 2242, 153 L.Ed.2d 335, fn. 3.

{¶ 7} The APA's definition is similar: " 'The essential feature of Mental Retardation is significantly subaverage general intellectual functioning * * * that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety * * *. The onset must occur before age 18 years * * *.' 'Mild' mental retardation is typically used to describe people with an IQ level of 50 to 55 to approximately 70." Id.

{¶ 8} In *State v. Lott,* 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, ¶ 12, we held: "Clinical definitions of mental retardation, cited with approval in *Atkins,* provide a standard for evaluating an individual's claim of mental retardation. * * * These definitions require (1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18."

II. The Proceedings Below

A. White's Evaluation

{¶ 9} At White's request, the trial court appointed Dr. David Hammer, a psychologist, as the petitioner's expert in mental retardation. The state retained as its expert Dr. John M. Fabian, a clinical and forensic psychologist.

{¶ 10} Drs. Hammer and Fabian jointly conducted testing to determine whether White was mentally retarded. They administered the Wechsler Adult Intelligence Scale, Third Edition ("WAIS–III"), a standard IQ test; the Wide Range Achievement Test, Third Edition ("WRAT–III"), which measures academic achievement; and the Scales of Independent Behavior—Revised ("SIB–R"), which measures adaptive skills. They also interviewed White to obtain information for the SIB–R. Finally, they reviewed White's educational, medical, correctional, and children-services records, along with earlier psychological evaluations performed in connection with White's aggravated-murder trial.

1. Intellectual Functioning

{¶ 11} Drs. Fabian and Hammer administered the WAIS–III on July 28, 2003. White's IQ, as measured by that test, was 52.

{¶ 12} Drs. Fabian and Hammer also administered the WRAT–III. White's WRAT–III scores "indicate very poor academic abilities * * * equivalent to

about the second-grade level." This result was consistent with White's score on the WAIS–III.

## 2. Adaptive Skills

{¶ 13} "[C]linical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills * * * that became manifest before age 18." *Atkins*, 536 U.S. at 318, 122 S.Ct. 2242, 153 L.Ed.2d 335. Adaptive skills are those skills that one applies to the everyday demands of independent living, such as taking care of oneself and interacting with others. Adaptive behavior tests are designed to assess how a person applies those skills in the tasks of everyday life.

{¶ 14} Drs. Hammer and Fabian used the SIB–R to assess whether White had significant limitations in adaptive skills. The SIB–R consists of 259 questions. Each question seeks to measure how well the subject can perform a particular task. The questions are divided among 14 "scales" or "domains." Each scale contains between 16 and 20 questions designed to evaluate the subject's skills in one of 14 categories: gross motor skills, fine motor skills, social interaction, language comprehension, language expression, eating and meal preparation, "toileting" (i.e., using the toilet), dressing, "personal self-care" (i.e., health and hygiene), domestic skills, time and punctuality, money and value, work skills, and "home/community orientation." The 14 scales are grouped into four "clusters": motor skills, social/communication, personal living, and community living.

{¶ 15} To administer the SIB–R, the examiner interviews "informants"—for example, parents, other relatives, or teachers—who are well acquainted with the person being evaluated. The informants provide the examiner with information about the subject's abilities. The examiner then uses this information to score the SIB–R.

{¶ 16} Each question on the SIB–R is scored on a scale of zero to three. According to Dr. Hammer, a zero means that the subject either cannot perform a particular task "or has not really had a chance to do something like that." A "1" means the subject "can't do [the task] very well." A "2" means he can "do it fairly well most of the time, but they might have to be asked to do it; they don't necessarily initiate on their own." A "3" means that the subject can routinely perform the task "very well and do it independently without being asked."

{¶ 17} The examiner explains this rating system to the informants, then asks them to rate how well the subject can perform each task. If the informant has never seen the subject attempt a particular task, or if the subject has never had an opportunity to perform it, the informant is asked to estimate the subject's ability to perform it. If the informants cannot make an estimate, the examiner

makes his own estimate, based on his observations of the subject and any other information he can obtain.

{¶ 18} When all questions have been scored, the points on each scale are added, yielding a raw score. A computer program converts the raw score into a scaled score for each scale. These scaled scores are averaged to yield a score for each cluster, and the cluster scores in turn are averaged to yield an overall "broad independence" score. The cluster scores can be used to cross-check the broad independence score for consistency.

{¶ 19} On July 28, 2002, after Dr. Fabian administered the WAIS–III to White, Drs. Hammer and Fabian together interviewed White for approximately one hour to evaluate his adaptive functioning. Dr. Hammer later used information from this interview in scoring White's SIB–R. However, he did not use White's information as his sole basis for scoring any question, and he estimated that "probably less than 10 percent" of his information came from White.

{¶ 20} On October 20, 2003, Drs. Hammer and Fabian together interviewed White's mother, his sisters Keisha and Erica, and his brother Eric. White's mother and Erica provided most of the information for Dr. Hammer's scoring of the SIB–R. Dr. Hammer later scored each question on the SIB–R, based on the family's responses and other information, including information obtained from White and his own observations of White.

{¶ 21} In Dr. Hammer's opinion, White had significant limitations in more than two of the ten adaptive-skill areas covered by the AAMR definition of retardation. In Dr. Fabian's opinion, White was deficient in 12 of the 14 areas measured by the SIB–R. Dr. Fabian considered White's overall adaptive skills comparable to those of an average person age 11 years, ten months.

{¶ 22} White's "broad independence" score on the SIB–R was 55. According to Dr. Hammer, a broad independence score below 70 indicates significantly subaverage functioning. White's overall score was consistent with the WAIS and WRAT results and was in the lowest percentile for White's age group.

### 3. Onset before Age 18

{¶ 23} White had not taken either an IQ test or an adaptive-skills test before age 18. To determine whether White's subaverage functioning began before 18, Drs. Hammer and Fabian reviewed White's school records. These records show that White's academic performance was poor. He failed numerous courses, repeated seventh grade, and was in tenth grade for three years before leaving school. In eighth grade, White was reading at a fourth-grade level and was doing mathematics at about a sixth-grade level.

{¶ 24} Although White's pre–18 adaptive skills had not been tested, Dr. Fabian testified that White's poor academic record supported a finding that his adaptive

deficits had their onset before age 18. According to Dr. Fabian, there is a correlation between intellectual and adaptive abilities. Moreover, White's records suggest a deficit in "functional academics," which is itself one of the adaptive skills relevant to a diagnosis of retardation.

{¶ 25} Additionally, the experts agreed that White's current adaptive deficits support their finding of onset of retardation before age 18. The experts testified that a person's developmental level is generally determined by approximately age ten. Thus, absent a severe brain injury or medical condition—of which there was no evidence in White's case—a person who has intellectual and adaptive deficits as an adult probably has had them since childhood.

## B. The Hearing on White's Petition

{¶ 26} On December 10, 2003, January 26 and 27, 2004, and April 19, 2004, the trial court held a three-part evidentiary hearing on White's postconviction *Atkins* claim. The state presented no expert testimony at the hearing, but did present the testimony of Heather Kawczk, who had been White's girlfriend from 1992 to 1995.

{¶ 27} Kawczk testified that White was popular in school and participated in activities with others. She testified that he worked, rented an apartment, bought a truck, and helped her when she bought a car. She also testified that White could cook, drive, and play games that required coordination.

{¶ 28} White presented the testimony of Dr. Hammer and the state's expert, Dr. Fabian. Additionally, Dr. Hammer was deposed in February 2004, and his deposition was admitted into evidence.

{¶ 29} Drs. Hammer and Fabian agreed that White meets the definition of mental retardation. Neither expert thought this conclusion was a "close call." Dr. Hammer testified that his opinion was confirmed by the "convergent validity" of the test results. In other words, White's current WAIS, WRAT, and SIB–R scores are consistent with his scores on previous intelligence and achievement tests and with his academic record, and all point to a diagnosis of mild mental retardation.

{¶ 30} Finally, at the trial court's request, Bradley K. Hill, a co-author of the SIB–R, testified as an expert witness to explain how the SIB–R was developed and how it is used to diagnose mental retardation.

## C. Decision and Findings of the Trial Court

{¶ 31} On February 28, 2005, the trial court denied White's petition for postconviction relief.

{¶ 32} The trial court found that White had established, by a preponderance of the evidence, the first of *Lott* 's three criteria: significantly subaverage intellectu-

al functioning. *Lott,* 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, ¶ 12. The trial court noted that White's IQ of 52 "easily satisfies" the intellectual-functioning portion of the legal test for mental retardation. The trial court also found "ample corroborative evidence" that White's IQ was below 70.

{¶ 33} However, the trial court found that White had failed to establish, by a preponderance of the evidence, the existence of *Lott*'s two other criteria: "significant limitations in two or more adaptive skills" and "onset before the age of 18." *Lott,* 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, ¶ 12.

### 1. Adaptive Skills

{¶ 34} Even though White's SIB–R results indicated that he suffered from significant limitations in adaptive skills, the trial court found that "a number of flaws * * * tend to dilute and compromise the probative value of the adaptive behavior test score."

{¶ 35} The trial court questioned the manner in which Drs. Hammer and Fabian administered the SIB–R. Dr. Fabian did not personally participate in scoring the SIB–R, and the trial court found that Dr. Fabian's diagnosis "relied heavily on Dr. Hammer's judgment."

{¶ 36} The trial court also questioned the reliability of the information used in scoring the SIB–R. White's mother and sister were Dr. Hammer's principal informants. Thus, White's SIB–R scores were based largely on information provided by his family. The trial court found that White's relatives "have reason to exaggerate in favor of a positive diagnosis of [mental retardation]." The trial court also noted that White's mother had once told psychiatrists that her son's teachers described him as "pretty smart if he put his mind to it."

{¶ 37} The trial court was troubled as well by Dr. Hammer's use of information provided by White himself. Citing Dr. Fabian's testimony, the trial court observed that "the recommendation of the AAMR is to use 'somebody other than the person [being graded]' " as an informant for the SIB–R.

{¶ 38} The trial court also found that some of White's low scores on SIB–R tasks were based on conjecture. For example, in several instances, Dr. Hammer assigned zeroes "for tasks that [White] never had an opportunity either to learn, or to perform."

{¶ 39} Finally, the trial court found that the testimony of Heather Kawczk demonstrated that White possessed social, conceptual, and practical adaptive skills inconsistent with retardation. While recognizing Kawczk's possible bias, the trial court found her testimony credible.

{¶ 40} Moreover, the trial court found, White was not perceived by those who knew him as having significant adaptive disorders. Kawczk's testimony provided "credible anecdotal evidence * * * to demonstrate a level of performance per-

ceived by [White's] closest companion to be reasonably sophisticated, other than retarded, and fairly well mainstream. In fact, not a single anecdote has been supplied to the experts, and restated to this court by anyone, of any incongruent behavior—something bizarre, something out of the ordinary—anecdotes which demonstrate that his family and peers considered him significantly deficient in adaptive behavior skills."

### 2. Onset before Age 18

{¶ 41} Finally, the trial court found that White had failed to prove that he had significant adaptive deficits before reaching age 18. No adaptive-skills test had ever been conducted on White before the 2003 SIB–R. Although Dr. Hammer opined that White would have shown deficits on such a test, the trial court found this opinion conjectural.

### D. Proceedings on Appeal

{¶ 42} The court of appeals affirmed the trial court's judgment, holding that the trial court did not abuse its discretion when it determined that White had failed to satisfy the second prong of the *Lott* standard by proving lack of adaptive skills. Having so held, the court of appeals declined to address the third prong, onset before age 18. *State v. White,* Summit App. No. 22591, 2005-Ohio-6990, 2005 WL 3556634, ¶ 23.

{¶ 43} White's discretionary appeal is now before us.

### III. The Merits of the Appeal

### A. The Standard of Review

{¶ 44} In *Lott,* we held that "[t]he procedures for postconviction relief outlined in R.C. 2953.21 et seq. provide a suitable statutory framework for reviewing" an *Atkins* claim by a defendant sentenced to death before *Lott.* 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, ¶ 13.

{¶ 45} Recently, in *State v. Gondor,* 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, we considered the standard for appellate review of postconviction proceedings. We held that abuse of discretion is the appropriate standard: "[A] trial court's decision granting or denying a postconviction petition filed pursuant to R.C. 2953.21 should be upheld absent an abuse of discretion; a reviewing court should not overrule the trial court's finding on a petition for postconviction relief that is supported by competent and credible evidence." Id.[3]

---

3. In his brief, filed before our decision in *Gondor,* 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, White argued that abuse of discretion is not the appropriate standard of review. At oral argument, however, he conceded that *Gondor* establishes abuse of discretion as the standard.

{¶ 46} "The term 'abuse of discretion' * * * implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144, citing *Steiner v. Custer* (1940), 137 Ohio St. 448, 19 O.O. 148, 31 N.E.2d 855; see, also, *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

### B. The Trial Court's Treatment of the Expert Testimony

{¶ 47} A capital defendant raising an *Atkins* claim "bears the burden of establishing that he is mentally retarded by a preponderance of the evidence." *Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, ¶ 21. In *Lott*, we instructed trial courts to "rely on professional evaluations * * * and consider expert testimony * * * in deciding" whether a capital defendant is mentally retarded. Id. at ¶ 18.

{¶ 48} In this appeal, White contends that the trial court abused its discretion by refusing to find that he had established retardation by a preponderance of the evidence, despite the testimony of two expert witnesses that he is mentally retarded and the lack of any expert testimony to the contrary. For the reasons that follow, we agree.

### 1. Adaptive Deficits

### a. The Trial Court's Rejection of the SIB–R

{¶ 49} The expert opinions of Drs. Hammer and Fabian were based substantially on the SIB–R. Both experts considered the SIB–R to be a valid tool for measuring adaptive skills. In their testimony, Drs. Hammer and Fabian described the SIB–R as "well developed," "mainstream," well standardized, useful, and reliable.

{¶ 50} Undisputed evidence at the hearing showed that the SIB–R was based on extensive empirical research. Hill testified that in deciding what skills to include on the test, the authors of the SIB–R used standard test-development procedures. The test developers interviewed a randomly selected, demographically representative group of 2,182 nonhandicapped persons. Their responses were used to determine which questions were most useful in distinguishing between persons who are mentally retarded and those who are not.

{¶ 51} According to Hill, standard measures of reliability show that the SIB–R is a reliable test. Although an SIB–R evaluation is not completely free of subjectivity, Hill testified that the SIB–R is "as objective as we could make it" and "one of the most objective ways to measure adaptive behavior that there is."

{¶ 52} Nevertheless, the trial court rejected the results of the SIB–R. The trial court questioned the results in part because in scoring the test, Dr. Hammer had utilized information provided by White himself. However, Dr. Hammer

estimated that "probably less than 10 percent" of his information came from White. Moreover, he did not use information provided by White as his sole basis for scoring any of the items on the SIB–R.

{¶ 53} Furthermore, the record does not demonstrate that it is necessarily improper to use the person being evaluated as an informant on the SIB–R. Dr. Fabian, whose testimony on this issue was cited by the trial court, testified: "I think that they *recommend* as a[n] SIB–R collateral [informant] individuals other than the person [being evaluated]." (Emphasis added.) Similarly, Mr. Hill—a co-author of the SIB–R—testified only that "[t]here's some caution in the manual" about using the subject as an informant. "I don't think it says you can't interview a person directly that you suspect is retarded, but it's unlikely that you would want to rely on them solely for the information."

{¶ 54} More important, the trial court failed to consider why the SIB–R manual discourages using the subject as an informant. Dr. Hammer and Mr. Hill both explained that using the subject as an informant is discouraged because mentally retarded persons tend to *overestimate* their own abilities. As Mr. Hill testified:

{¶ 55} "There's some * * * research literature, that shows that if you interview a retarded person directly about themselves, that they often *overestimate* their abilities, that * * * they want to brag about the abilities they have or that they're not always a reliable respondent.

{¶ 56} "There's never been any research to my knowledge cautioning people not to interview a retarded person directly because they underestimate their score." (Emphasis added.)

{¶ 57} Hence, the record lends no support to the trial court's apparent belief that using White as an informant for the SIB–R compromised the validity of the diagnosis of mental retardation reached by the experts in this case.

### b. The Trial Court's Reliance on Anecdotal Lay Testimony

{¶ 58} The trial court relied heavily on the testimony of White's ex-girlfriend, Heather Kawczk, in reaching its conclusion that White failed to prove significant adaptive limitations.

{¶ 59} Kawczk testified that she met White in the fall of 1992, when they attended high school together. She dated him until November 1995 and lived with White and his mother for over a year. In the fall of 1995, White and Kawczk shared an apartment for one and one-half to two months.

{¶ 60} Kawczk testified that White was popular in school, "got along with a lot of people at school," and participated in activities with others. White and Kawczk went driving together. He took her to the homecoming dance, double-

dating with another couple, and to a party afterward where they "hung out" with other students. They attended high-school sporting events together.

{¶ 61} Kawczk testified that White purchased a used truck and helped her when she purchased a used car. When he drove, White obeyed traffic rules. When White decided to rent an apartment, he signed a lease and made a deposit. White also directed Kawczk to conceal from the landlord that she was living there with him.

{¶ 62} Kawczk testified that White had taught her to play spades, a card game, and a fast-moving card game called "speed." He also played basketball and "Mortal Kombat," a fast-paced video game, which he won about half the time. He could cook bacon and eggs and heat refrigerated chicken wings in the oven.

{¶ 63} Dr. Hammer was present in the courtroom during Kawczk's testimony.[4] Dr. Hammer testified that White's family had already told him, in the October 2003 interview, many of the facts Kawczk related in her testimony.

{¶ 64} Nevertheless, after Kawczk testified, Dr. Hammer rescored the SIB–R to reflect information gleaned from her testimony. As a result, Dr. Hammer increased White's scores on five of the 259 items. This revision did not significantly improve White's overall score, which rose only two points, from 55 to 57. Hence, rescoring the test did not alter Dr. Hammer's opinion that White is mentally retarded.

{¶ 65} According to the undisputed testimony of the expert witnesses in this case, the facts stated in Kawczk's testimony are in no way inconsistent with mild mental retardation. The mentally retarded are not necessarily devoid of all adaptive skills. Indeed, "they may look relatively normal in some areas and have certain significant limitations in other areas." Mildly retarded persons can play sports, write, hold jobs, and drive. Dr. Hammer testified that in determining whether a person is mentally retarded, one must focus on those adaptive skills the person lacks, not on those he possesses.

{¶ 66} The trial court's analysis appears to disregard this testimony. For example, the trial court's opinion mentions twice that White was a licensed driver. However, Dr. Hammer testified that a mildly retarded individual can qualify for a driver's license and that licensed-driver status is not a good criterion for distinguishing between people who are and are not retarded.

{¶ 67} Similarly, the trial court found that White "was adept at video games, including * * * 'Mortal Kombat.'" It is not clear, however, what relevance White's video-game skills have to mental retardation. Dr. Hammer testified that

---

4. Ordinarily, White, as the party bearing the burden of persuasion, would have presented his evidence first. However, the parties and the trial court agreed to let the state present Kawczk as the first witness so that Dr. Hammer could hear her testimony.

Mortal Kombat "doesn't require a lot of planning [or] strategizing" and can be played by children younger than ten.

{¶ 68} The trial court's analysis was also misdirected in stressing that White's family and peers did not perceive White to be lacking in adaptive behavior skills. Both experts testified that laymen cannot easily recognize mild mental retardation. Likewise, the trial court erred in focusing on whether White had exhibited behavior that was "bizarre" or "out of the ordinary." There was no evidence that bizarre behavior is a necessary attribute of the mentally retarded.

{¶ 69} Especially relevant here is Dr. Hammer's already cited observation that retarded individuals *"may look relatively normal in some areas* and have * * * significant limitations in other areas." (Emphasis added.) In light of that unrebutted testimony, the impressions of White's peers as relayed by Kawczk lend no support to the findings of the trial court.

{¶ 70} We conclude that the trial court abused its discretion when it determined that White had failed to prove the existence of significant adaptive-skills limitations. In this case, the trial court failed to set forth any rational basis grounded in the evidence for rejecting the uncontradicted testimony of two qualified expert witnesses in the field of psychology.

{¶ 71} A trial court is not required to automatically accept expert opinions offered from the witness stand, whether on mental retardation or on any other subject. See *State v. Dickerson* (1989), 45 Ohio St.3d 206, 210, 543 N.E.2d 1250 (expert testimony is not necessarily conclusive); *Ex parte Briseno* (Tex.Crim. App.2004), 135 S.W.3d 1, 9 (although experts may offer insightful opinions, ultimate issue of mental retardation is for the trier of fact). Nevertheless, expert opinion "may not be *arbitrarily* ignored, and some reason must be objectively present for ignoring expert opinion testimony." (Emphasis added.) *United States v. Hall* (C.A.5, 1978), 583 F.2d 1288, 1294. See also *State v. Brown* (1983), 5 Ohio St.3d 133, 134–135, 5 OBR 266, 449 N.E.2d 449 (trial court erred by disregarding expert opinions that defendant was insane, in the absence of evidence to the contrary).

{¶ 72} In this case, the anecdotal evidence on which the trial court focused its attention was largely irrelevant. Moreover, to the extent that the anecdotal evidence was relevant, Dr. Hammer took it into account in scoring the SIB–R. There was no evidence calling into doubt the reliability of the SIB–R.

{¶ 73} Nor did the trial court make any finding that the expert witnesses before it lacked either credentials or credibility. On the contrary, the court described Dr. Hammer as "a distinguished expert" with "impressive" credentials. And the trial court's rejection of the expert testimony was not based on any credibility determination. The trial court stated: *"It is not so much that Dr. Hammer's testimony lacks credibility,* as * * * that the ingredients for the

[SIB–R] test are patently at odds with the credible testimony of Ms. Kawczk." (Emphasis added.)

{¶ 74} While the trial court is the trier of fact, it may not disregard credible and uncontradicted expert testimony in favor of either the perceptions of lay witnesses or of the court's own expectations of how a mentally retarded person would behave. Doing so shows an arbitrary, unreasonable attitude toward the evidence before the court and constitutes an abuse of discretion.

## 2. Onset before Age 18

{¶ 75} The trial court also determined that White had failed to prove that his adaptive-skills limitations began before age 18. Whether the trial court's determination of this issue was correct was necessarily raised by appellant's assignment of error in the court of appeals. However, it was not addressed in the appellate court's opinion. Apparently, the court of appeals believed that its review of the "pre-age 18 onset" issue was unnecessary because it was upholding the adaptive-skills finding of the trial court. Because we have determined that the trial court erred in making this finding, however, we must now address the "pre-age 18 onset" issue. In the interest of judicial economy, we will address that issue today, in order to make a complete and final resolution of this matter while the record is before us.

{¶ 76} A finding that White's adaptive-skills limitations began after age 18 would preclude a finding of mental retardation under *Lott*. However, White claims that the trial court's determination in this regard was also an abuse of discretion. Upon our review of the record, we must agree.

{¶ 77} Although no adaptive-skills tests had ever been conducted on White before he reached the age of 18, Dr. Hammer believed that White would have attained a low score had such testing been conducted. The state introduced no evidence to the contrary. Yet the trial court found that Dr. Hammer's opinion, in the absence of any *actual* pre–18 adaptive-skills testing, was "conjectur[al]" and did not establish the existence of adaptive deficits before the age of 18.

{¶ 78} In our view, the trial court's finding on this issue does not comport with the evidence in the record. Although White had taken neither an IQ test nor an adaptive-skills test before age 18, Drs. Hammer and Fabian were able to review White's academic records. These records strongly support the experts' conclusion that White's intellectual and adaptive deficits had their onset before age 18.

{¶ 79} White's academic records attest to his poor performance in school. When White was in seventh grade, during the 1985–1986 school year, he failed seven of ten subjects. The next year, he repeated seventh grade and failed four of nine subjects. In eighth grade, White failed two of eight subjects.

{¶ 80} During his eighth-grade year, White took the California Achievement Test ("CAT"), described by Dr. Fabian as "an academic achievement test similar [to] or [the] same as the WRAT." White's CAT scores reflect a performance well below the eighth-grade level. CAT scores indicated that his reading abilities were at the fourth-grade level and his language abilities at the third-grade level. His best subject on the CAT was mathematics, but even there, he reached only a sixth-grade level.

{¶ 81} In 1988, the 15–year–old White was placed in an alternative school, but continued to perform poorly. In ninth grade, his grade-point average was 1.625. In tenth grade, White failed six of the seven courses in which he was awarded a grade. At 17, he repeated tenth grade and failed every course in which he received a grade. At 18, he repeated tenth grade again, this time failing six of seven courses. At 19, he was placed in the tenth grade for a fourth time, but school authorities later removed him because he was too old.

{¶ 82} Dr. Hammer's interviews with White's family corroborated the picture that emerges from White's records. The family told Dr. Hammer that White "was having trouble with schoolwork, that he oftentimes would not let people * * * help him, he would become easily frustrated when people would try to help him * * * with the academic things." White's childhood academic performance, as reflected in both school records and family interviews, "was basically consistent with mild mental retardation," according to Dr. Hammer.

{¶ 83} Finally, there was no evidence to suggest that White's current impairments could be explained by anything that happened after he turned 18, such as a brain injury. Dr. Hammer testified that White's records contained no evidence of any such event. Nor does anything in White's history indicate that he functioned at a higher level before age 18 than he does today.

{¶ 84} As Dr. Hammer explained, the purpose of the "onset before age 18" requirement is to distinguish true retardation from cognitive impairments acquired later in life and caused by brain injuries or mental conditions. Both expert witnesses testified that a person's mental-retardation status does not change over his lifetime. Hence, if an adult is found to have intellectual and adaptive deficits not caused by a brain injury or illness, it can be inferred that those deficits have existed since childhood.

{¶ 85} We think that the trial court, by rejecting well-supported expert opinion regarding pre–18 onset without any evidence to the contrary, abused its discretion. The trial court gave too much weight to the fact that White's adaptive skills were never tested before age 18. As Dr. Hammer explained in his testimony, such testing will often not have taken place, particularly in cases of mild mental retardation.

### IV. Conclusion

{¶ 86} For the foregoing reasons, we reverse the judgment of the court of appeals.

Judgment reversed.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'TOOLE, O'DONNELL, and LANZINGER, JJ., concur.

COLLEEN MARY O'TOOLE, J., of the Eleventh Appellate District, sitting for O'CONNOR, J.

————————

Sherri Bevan Walsh, Summit County Prosecuting Attorney, and Richard S. Kasay, Assistant Prosecuting Attorney, for appellee.

David Bodiker, Ohio Public Defender, and Kathryn L. Sandford and Richard J. Vickers, Assistant Public Defenders, for appellant.

Michael Kirkman and Jane P. Perry, urging reversal for amici curiae Ohio Legal Rights Service and The Arc of Ohio.