PARIENTE, J.,
concurring in part and dissenting in part.
The sole issue in this appeal concerns the propriety of the trial court’s determination that Dufour was not mentally retarded. Because of significant errors in *256 the trial court’s evaluation of Dufour’s IQ and adaptive functioning, we should remand to the trial court for a reevaluation of the evidence regarding the IQ and adaptive functioning prongs using the correct legal standards. In our emerging jurisprudence on the evaluation of mental retardation in connection with the death penalty, we must be certain that we are utilizing objective and scientifically acceptable measures for evaluation of both IQ and deficits in adaptive behavior.
I therefore agree with the majority that the trial court erred in its evaluation of Dufour’s IQ and that this error is not harmless beyond a reasonable doubt. I disagree, however, that we should affirm based on the failure of Dufour to prove deficits in adaptive behavior because, as discussed below, the trial court made three significant errors when analyzing this prong. I also dissent from the portions of the majority opinion that utilize non-record evidence of the specific requirements and difficulty of the GED given to Dufour in order to refute the existence of Dufour’s adaptive functioning deficits. This evidence concerning how rigorous the specific version of the GED that Dufour took was neither presented nor argued by the State and accordingly I am concerned that Duf-our was deprived of the opportunity to refute the majority’s conclusions regarding the significance and difficulty of the specific version of the GED that Dufour took. This potential problem with the record evidence regarding the rigors of a specific version of the GED could be avoided by remanding for a reevaluation by the trial court of all the evidence, thereby providing the parties an opportunity to be heard.[6]
As to the trial court’s error in evaluating the IQ, the trial court accepted Dr. McClain’s score of 67 as the most reliable but then applied the standard error of measure to the score, adding five points. In this case, it would therefore appear that a likelihood exists that Dufour’s IQ is significantly subaverage. Thus, the two other prongs of the three-part test for mental retardation become important to evaluate: concurrent deficits in adaptive behavior in at least two areas and onset before age 18.
Although I agree that there may be cases where we could affirm the trial court based on findings on adaptive functioning alone, I do not agree that this is one of those cases. In this case, there is reason to question the trial court’s evaluation of adaptive functioning because the trial court failed to focus on “deficits” in adaptive behavior, failed to properly evaluate Dr. Keyes’ objective testimony of deficits in adaptive behavior, and rejected the evidence relating to deficits in adaptive behavior based on an “alternative explanation” for the deficits. I will explain each of my concerns in turn.
In my view, the trial court first erred by failing to focus on Dufour’s established “deficits in adaptive behavior.” In other words, the focus in evaluating adaptive behavior should be on the individual’s limitations, rather than his or her demonstrated adaptive skills. This proposition is supported both by the American Association on Intellectual and Developmental Disabilities’ (AAIDD) definition of mental *257 retardation, as well as the language of section 921.137, Florida Statutes (2006), and Florida Rule of Criminal Procedure 8.203. See § 921.137(1), Fla. Stat. (2006) (“[T]he term ‘mental retardation’ means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18.” (emphasis added)); Fla. R.Crim. P. 3.203(b) (“[T]he term ‘mental retardation’ means significantly subaver-age general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18.” (emphasis added)).
In stating that the focus is on an individual’s limitations, I do not mean that a court is precluded from reviewing the full picture or considering whether a deficit does or does not exist. In fact, courts must review all available evidence in order to determine this prong. But a court cannot reject a determination that deficits exist simply because a defendant has strengths in certain other areas. In other words, possessing certain adaptive skills in one area does not eliminate the possibility that the defendant has deficits in other areas.
Section 921.137(1) defines adaptive behavior as “the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community.” § 921.137(1), Fla. Stat. (2006). For the purpose of implementing the adaptive behavior prong, since the enactment of the statute, Florida courts have adopted the analytic framework set forth in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). See Nixon v. State, 2 So.3d 137, 143 (Fla.2009); Phillips v. State, 984 So.2d 503, 511 (Fla.2008); Jones v. State, 966 So.2d 319, 326-27 (Fla.2007). Specifically, when defining mental retardation, the United States Supreme Court explained deficits in adaptive behavior as “limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.” Atkins, 536 U.S. at 308 n. 3, 122 S.Ct. 2242 (quoting Am. Ass’n on Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992)).[7]
In finding that Dufour is not mentally retarded based on his failure to establish deficits in adaptive behavior, the trial court relies significantly on the adaptive skills Dufour does possess, rather than his deficits. For example, the trial court stated in its findings on adaptive behavior:
*258 Mr. Dufour does not read or write much, if at all. He does not play chess in the Department of Corrections. He does not have good hygiene habits. In the past, he drove a car and possessed a driver’s license. He participated in teaching a small engine repair class while in prison in the 1970’s. He could be good with children. He was capable of interacting in social situations, and could be friendly and engaging. He appeared to understand discussions with his trial counsel.
This approach to assessing adaptive behavior is at odds not only with the statutory definition itself but also with the current consensus within the scientific community as to the proper method for assessing adaptive behavior in the criminal justice context. Specifically, the AAIDD and the DSM-IV stress that the focal point of adaptive behavior should be on the individual’s limitations rather than demonstrated adaptive skills. An important reason for this policy is that “[t]he skills possessed by individuals with mental retardation vary considerably, and the fact that an individual possesses one or more that might be thought by some laypersons as inconsistent with the diagnosis (such as holding a menial job, or using public transportation) cannot be taken as disqualifying.” James W. Ellis, Mental Retardation and the Death Penalty: A Guide to State Legislative Issues, 27 Mental & Physical Disability L. Rep. 11, 21 n.29 (2003).
The AAIDD, in its amicus brief to this Court, explains that the significant limitations in adaptive behavior must be based on objective measurements and not weighed against adaptive strengths. The purpose of the adaptive functioning prong is to ascertain whether the measured intellectual score reflects a real-world disability, as opposed to a testing anomaly. Thus for this prong, the diagnostician’s focus must remain on the presence of confirming deficits. Accordingly, the AAIDD has specifically noted that “assessments must ... assume that limitations in individuals often coexist with strengths, and that a person’s level of life functioning will improve if appropriate personalized supports are provided over a sustained period.” Am. Ass’n on Intellectual & Developmental Disabilities, Definition of Intellectual Disability, http://www.aaidd.org/content_100.cfm?nav ID=21 (last visited Jan. 14, 2011).[8] Further, as the AAIDD correctly explains, much of the clinical definition of adaptive behavior is much less relevant in prisons, and in fact, a person with mental retardation is likely to appear to have stronger adaptive behavior in a structured environment such as a prison than in society. The amicus brief of the AAIDD further points out that “[stereotypes and lay assumptions, about people with mental retardation can cloud or distort individual assessment.”
The failure to take an objective approach to deficits in adaptive behavior can result in the perpetuation of misunderstanding mental retardation. In State v. White, 118 Ohio St.3d 12, 885 N.E.2d 905 (2008), the Supreme Court of Ohio reversed the tidal court’s finding that White failed to prove significant deficiencies in adaptive behavior. In its opinion, the court focused on concerns similar to those *259 advanced by the AAIDD as to improperly focusing on an individual’s demonstrated adaptive skills and placing too much importance on lay testimony regarding White’s demonstrated adaptive skills:
The mentally retarded are not necessarily devoid of all adaptive skills. Indeed, “they may look relatively normal in some areas and have certain significant limitations in other areas. ” Mildly retarded persons can play sports, write, hold jobs, and drive. Dr. Hammer testified that in determining whether a person is mentally retarded, one must focus on those adaptive skills the person lacks, not on those he possesses.
The trial court’s analysis appears to disregard this testimony. For example, the trial court’s opinion mentions twice that White was a licensed driver. However, Dr. Hammer testified that a mildly retarded individual can qualify for a driver’s license and that licensed-driver status is not a good criterion for distinguishing between people who are and are not retarded.
[[Image here]]
The trial court’s analysis was also misdirected in stressing that White’s family and peers did not perceive White to be lacking in adaptive behavior skills. Both experts testified that laymen cannot easily recognize mild mental retardation ....
... In light of [Dr. Hammer’s] unre-butted testimony, the impressions of White’s peers ... lend no support to the findings of the trial court.
WMie, 885 N.E.2d at 914-15 (emphasis added). While the Ohio Supreme Court recognized that a trial court is the trier of fact, the court concluded that the trial court abused its discretion in making this determination by disregarding “credible and uncontradicted expert testimony in favor of ... the court’s own expectations of how a mentally retarded person would behave.” Id. at 915.
In this ease, the trial court likewise erred in failing to properly evaluate Dr. Keyes’ objective testimony in regard to deficits in adaptive functioning. Although the trial court stated that Dr. Keyes provided a “great deal of substantive information about mental retardation” and found that his opinion was entitled to moderate weight and was “very useful in arriving at a legal conclusion,” these findings are in seeming contradiction to the trial court’s ultimate findings that the defendant failed to produce sufficient evidence that his adaptive behavior is impaired to the degree necessary to support a finding of mental retardation, either under the clear and convincing standard or under the preponderance of the evidence standard. The trial court does not explain whether it found the State’s expert witnesses to be more credible on the topic of adaptive behavior. Further, the trial court does not appear to provide an underlying reason for discounting any of Dufour’s lay and expert witness testimony regarding adaptive behavior.
In this regard, there was significant evidence supporting a claim of deficits in adaptive functioning. Dr. Keyes conducted adaptive functioning testing on Dufour and as part of the assessment, interviewed Dufour, two inmates on death row whose cells were adjacent to Dufour’s, and two individuals who knew Dufour prior to the age of 18. On the tests administered by Dr. Keyes, Dufour ultimately scored more than two standard deviations below the mean on the General Adaptive Composite, which is consistent with mental retardation. Further, various witnesses established that Dufour never lived alone, always relied on others for help and support, was not in charge of paying bills, never held a job for more than a few months, and *260 never had a checking account, and that the jobs he did hold were menial, he was easily-led around and influenced by others, and he was always more comfortable playing with children. Even State witness Dr. McClaren agreed that Dufour’s history of academic failure and menial jobs, along with his history of poor relationships, could be consistent with a diagnosis of mental retardation. The evidence demonstrates that Dufour has significant adaptive functioning limitations in communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.
The testimony also established that Duf-our demonstrated “abysmal” academic performance in school. He failed kindergarten and had to repeat second grade. He never passed second grade, but instead was “placed” for the remainder of elementary school. Dufour was also in the lowest level of classes, i.e., basic. Dufour’s basic English teacher in seventh grade, Joyce Jones, described Dufour’s mental abilities as below average and thought he was “very possibly” mentally retarded. She also described him as immature, “like a little kid.” She did not remember Dufour having any friends. Dufour did not graduate from vocational technical school. Further, evidence demonstrated that Dufour has difficulty with spelling, punctuation, and grammar and reads at a basic level.
While there is evidence that Dufour learned to perform small-engine repair while incarcerated, even the State’s expert witness Dr. Merin acknowledged that people with mental retardation can also be taught carpentry skills, how to fix complex items, work in a stockroom, and drive an automobile. While I acknowledge evidence that the defendant obtained his GED is relevant to the court’s inquiry, this fact alone does not eliminate a finding that Dufour was mentally retarded, especially in light of his overall academic performance and his uncontroverted significantly subaverage IQ of under 70. Additionally, the majority opinion discusses the significance and difficulty as to the specific version of the GED that Dufour was given based on non-record evidence, which neither the State nor its witnesses presented or discussed. Attributing significance to the GED that was not specifically argued, based on non-record evidence, deprives Dufour of the opportunity to explain or counter these conclusions.
Finally, and importantly, the trial court committed a significant error in its analysis of this prong by rejecting the deficits in adaptive behavior based on an “alternative explanation” for the deficits. Specifically, the trial court found any deficits in Duf-our’s adaptive behavior were not caused by mental retardation, but were the consequence of intense drug use and his “deplorable home environment.” The majority perpetuates the error by accepting these findings. Contrary to the trial court and the majority, nothing within the plain language of section 921.187 or rule 3.203 requires proof as to the causation of deficits in adaptive functioning — only that the defendant has such deficits. In determining whether a defendant has shown mental retardation, this Court is confined to the statutory definition of “mental retardation” and is not at liberty to add additional requirements or exceptions to the definition.
Nothing within the statutory requirements or within the clinical definition of mental retardation supports the theory that determining the cause of the deficits is a part of the inquiry in determining mental retardation. Moreover, the trial court does not rely on any expert opinion to support its conclusion that alternative explanations can disqualify a person who otherwise would be considered mentally *261 retarded based on meeting each prong in the statutory definition of the term.
The statute and rule define mental retardation as a condition that meets the above three prongs, without specifying the origin of the disability.[8] In this case, retardation have no identifiable origin. See Am. Ass’n on Intellectual & Dr. Keyes, a very qualified expert in mental retardation, explained that Dufour has numerous risk factors for mental retardation: traumatic brain injury before the age of 18, malnutrition, an impaired childcare giver (his alcoholic abusive father), lack of adequate stimulation, domestic violence, and child abuse.
Specifically, there was evidence that after he was born, Dufour suffered from traumatic brain damage from an unidentified source, lacked adequate stimulation, was abused as a child, and suffered multiple head injuries, both before and after the age of 18. Further, Dufour started using alcohol and drugs at a very young age, including inhaling toluene or glue at the age of ten. In other words, his “deplorable home environment” and intense drug use may have been contributing factors to his mental retardation, but those risk factors are not a basis to reject a finding of mental retardation.
The Eighth Amendment’s protection against execution afforded to mentally retarded individuals does not depend on the cause of the mental retardation. Further, a trial court’s approach relating to alternative explanations has the potential to place a significant and unnecessary roadblock in front of a defendant who is attempting to establish mental retardation. A capital defendant who attempts to establish that he is mentally retarded may have multiple risk factors for mental retardation in his or her background such as abusive childhood (with physical and sexual abuse), lack of childhood stimulation (including abandonment and neglect by parents), and substance abuse. The linchpin for the deficits in adaptive behavior and significantly sub-average IQ is that both of these prongs must have been manifested before the age of 18. The cause of the deficits in adaptive behavior is not part of the inquiry as long as the defendant can prove he meets all three prongs.
In conclusion, I believe that this Court would be well-served in remanding this case for a reevaluation of the evidence presented so that we can be assured that findings regarding mental retardation are based on solid, scientifically acceptable explanations. While it may very well be that the totality of the circumstances supports a finding that Dufour is not mentally retarded, this review should occur after the trial court reevaluates the IQ and adaptive behavior prongs. Therefore, for the reasons expressed above, I would remand for a reevaluation of the evidence by the trial court.
QUINCE and PERRY, JJ., concur.

. Contrary to the majority’s characterization, I do not dispute that the State presented evidence that Dufour obtained his GED or that the experts used this information in evaluating whether Dufour is mentally retarded. However, the majority relies on non-record sources in discussing the rigors and specific requirements of the version of the GED that Dufour took in 1978 — information which was not presented by Dr. Merin or Dr. McClaren. I take issue only with the non-record evidence that is utilized in the majority opinion. See majority op. at 28-29.

. Atkins adopted this framework from the AAIDD’s 1992 definition of mental retardation, which was substantially similar to the definition of mental retardation set forth by the American Psychiatric Association (APA) in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (2000) (DSM-IV): (1) significantly subaverage general intellectual functioning that is accompanied by (2) significant limitations in adaptive functioning in at least two skill areas (communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety); and (3) the onset must occur before age 18. Atkins, 536 U.S. at 308 n. 3, 122 S.Ct. 2242 (quoting Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000)). However, unlike the AAIDD definition, the DSM-IV definition still distinguished between degrees of mental retardation (i.e., mild, moderate, severe, and profound). See Atkins, 536 U.S. at 308 n. 3, 122 S.Ct. 2242; J. Gregory Olley & Ann W. Cox, Assessment of Adaptive Behavior in Adult Forensic Cases: The Use of the Adaptive Behavior System — II, in Adaptive Behavior Assessment System-II, Clinical Use & Interpretation 383 (Thomas Oakland & Patti L. Harrison ed., 2008).

. The AAIDD has ■ explicitly stated that "[mjental retardation and intellectual disability are two names for the same thing. But intellectual disability is gaining currency as the preferred term.” Am. Ass’n on Intellectual & Developmental Disabilities, FAQ on Intellectual Disability, http://www.aaidd.org/ content- 104,-cfm (last visited Jan. 14, 2011). However, the term "mental retardation” is the term that is generally contained in current federal and state laws.

. In fact, approximately forty to fifty percent of the causes of mental Developmental Disabilities, FAQ on Intellectual Disability, http:// www.aaidd.org/content_104.cfm (last visited Jan. 14, 2011).