[Cite as *In re A.Z.*, 2022-Ohio-3943.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY**

| | |
|---|---|
| IN THE MATTER OF: A.Z. | : |
| | : |
| | : |
| | :     Appellate Case No. 2022-CA-9 |
| | : |
| | :     Trial Court Case No. 21130259 |
| | : |
| | :     (Appeal from Common Pleas Court- |
| | :     Juvenile Division) |
| | : |
| | : |

. . . . . . . . . . .

O P I N I O N

Rendered on the 4th day of November, 2022.

. . . . . . . . . . .

TOM O. MERRITT, Atty. Reg. No. 0066661, 1480 West Main Street, Tipp City, Ohio
45371
     Attorney for Appellant, Mother

PHILLIP D. HOOVER, Atty. Reg. No. 0034386, 77 West Main Street, Xenia, Ohio 45385
     Attorney for Appellee, Father

. . . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** Mother appeals from a judgment naming Father as the legal and residential parent of the parties' minor child and granting Mother the standard order of parenting time. Mother has not presented a specific assignment of error, but she contends that the magistrate's decision was an abuse of discretion. Father did not file an appellate brief.

**{¶ 2}** Because Mother's objections in the trial court were general, our review is for plain error only. Applying that standard, and having reviewed the record, we conclude that this is not the extremely rare case involving exceptional circumstances where error has affected the legitimacy of the judicial process. Further, there was no plain error. Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

**{¶ 3}** This case has a long history, beginning in February 2018, when Father filed a complaint to allocate parental rights and responsibilities and a motion for temporary and permanent custody, or in the alternative, shared parenting of the parties' daughter, A.Z., who was born in December 2008. The complaint alleged that Mother had interfered with Father's visitation rights, that A.Z. had asked to live with Father, that Mother had mental health issues, and that A.Z. had made allegations about Mother's sexual conduct. In March 2018, an agreed interim order was filed, granting Father standard parenting time and appointing a guardian ad litem ("GAL").

**{¶ 4}** In December 2018, Father dismissed the complaint and refiled it a week later. In February 2019, the court again granted Father standard parenting time and

reappointed the GAL. Mother then filed a motion in March 2019 seeking custody and to establish Father's parenting rights. She followed this in July 2019 with a motion to show cause based on Father's alleged violation of the parenting order and nonpayment of child support which, at that point, had resulted in an alleged arrearage of more than $21,000. Eventually, in August 2019, the parties filed an agreed entry disposing of the various issues. Mother was made sole legal custodian and residential parent, and Father was to have a standard weekend parenting schedule. Father stipulated to being in arrears on child support but sentencing was deferred, and Mother's motion to initiate sentence was dismissed. (Throughout the action and previously, Father had been unemployed and was seeking disability.)

{¶ 5} On January 6, 2020, Father filed an ex parte motion for temporary custody based on the following allegations: (1) Mother had slapped A.Z. in the face on December 14, 2020, knocking her off a couch; (2) in the weeks that followed, A.Z. was subjected to a pornographic video of Mother; (3) when Mother became aware of this, Mother said she was contemplating suicide and indicated an intent to take A.Z. out at the same time; and (4) Mother's mental health history required that homicidal/suicidal ideations must be taken seriously. The same day, the court granted Father's ex parte motion and ordered supervised visitation for Mother. After Mother filed a request for a full hearing, the court set a continuing effects hearing for January 29, 2020.

{¶ 6} Based on various intervening motions, including Mother's motion to suspend parenting time due to Father's alleged alienation of A.Z. and a show cause motion, the full hearings did not finish until April 23, 2020. In the interim, Father had also filed a

motion to reallocate parental rights and responsibilities in February 2020.

{¶ 7} After the hearings, the magistrate found A.Z. credible as to the slap allegation and Mother's threats. The magistrate therefore concluded that reasonable cause existed to believe A.Z.'s best interest and welfare required immediate intervention when the ex parte grant of custody was made and that continuing the order was in A.Z.'s best interest. Due to the passage of time, the magistrate found supervised visitation was no longer needed and gave Mother standard parenting time. Magistrate's Order (June 2, 2020), p. 5.

{¶ 8} Mother filed objections and supplemental objections to the order, but the trial court denied Mother's objections and adopted the magistrate's order on September 23, 2020. On September 25, 2020, the parties dismissed their pending motions and agreed to preserve the orders then in effect. This was reflected in an agreed order filed on October 27, 2020, in which the temporary parenting time was also preserved pending a full hearing on custody motions. In the meantime, Father filed another motion to reallocate parental rights and responsibilities on October 19, 2020. Mother then filed a motion on October 26, 2020, seeking permanent custody, suspension of Father's parenting time, and reallocation of parental rights and responsibilities based on Father's unjust allegations and parental alienation. The GAL was again reappointed. In November 2020, a final hearing was set for April 13, 2021.

{¶ 9} Further issues arose in December 2020 concerning allegations that Mother and her boyfriend, T.D., had engaged in sexual intercourse in the same room as A.Z. and another minor child. The allegations were being investigated by the police and Children

Services.    On December 21, 2020, Mother filed a show cause motion based on Father's alleged denial of parenting time due to the allegations.    Father then filed a motion on January 4, 2021, seeking to modify or terminate Mother's visitation or for supervised visitation based on the sexual conduct allegations.    The magistrate set a hearing for February 25, 2021.

{¶ 10} After that hearing, the magistrate filed a decision on March 1, 2021.    The magistrate noted that Mother had "admitted having sex; said she thought child was asleep, when asked to stop, did.    Mother also later denied it.    Child described it in graphic detail."    Magistrate's Decision (Mar. 1, 2021), p. 3.    The magistrate also noted two other incidents, one where A.Z. had described seeing her mother having sex with another man a year ago and one with the boyfriend (T.D.) a few months ago.    *Id.*

{¶ 11} The magistrate found A.Z. very credible and also found the caseworker credible concerning her interaction with Mother.    *Id.* at p. 5.    Due to the need to protect A.Z., the court ordered Mother to address the issue in counseling and further ordered that no men other than relatives were allowed at Mother's residence during visitation or on trips out of town.    *Id.*    Mother was allowed to petition the court for removal of the restriction after her counselor determined that Mother understood the impact of her behavior on A.Z.    *Id.*

{¶ 12} Mother again objected to the magistrate's decision.    On May 5, 2021, the trial court overruled Mother's objections with respect to the parenting time orders.    The court found that A.Z. had experienced and was reporting trauma and needed to be protected.    The court found that restricting Mother's parenting time was the best way to

protect A.Z. pending a full evidentiary hearing. The court imposed the same conditions as the magistrate had and added that Mother was not to expose A.Z. to any sexual situations, including pornography from any source. Mother was also not allowed to have A.Z. overnight and was to return her by 10:00 p.m. on visitation days.

{¶ 13} Various motions were filed prior to the final hearings in this matter, which occurred over eight days (Sept. 21, Oct. 6, 12, and 27, Nov. 11, 22, and 23, and Dec. 6, 2021). During trial, the parties presented testimony from themselves and from numerous witnesses, including a parental alienation expert; three Children Services' caseworkers; a police officer; Mother's current husband (T.D., the boyfriend at the time of the alleged sexual incident); Father's partner, Tami; A.Z.'s maternal grandmother; a probation officer; T.D.'s ex-wife; A.Z., and the GAL. The magistrate restricted testimony to events occurring after early August 2019 but allowed the parties to ask the alienation expert about events before that date, such as whether a party had disclosed a prior issue that might pertain to his evaluation.

{¶ 14} After considering the evidence, the magistrate filed a decision on January 24, 2022, recommending that Father be named legal custodian and residential parent. The magistrate further held that Mother was entitled to the standard order of visitation, subject to several conditions, including that she engage in mental health counseling to address appropriate sexual boundaries and to work on her relationship with A.Z. In addition, the magistrate ordered that T.D. must engage in counseling, addressing appropriate sexual boundaries and appropriate communication with children, and that A.Z. must also be involved in counseling. T.D. was not permitted to be present for

visitation until the court found that all three counselors believed it was appropriate. The magistrate additionally ordered Father to obtain counseling to learn appropriate means of dealing with Mother.

{¶ 15} On February 2, 2022, Mother filed general objections to the magistrate's decision and a motion for preparation of transcripts from the hearings. On February 3, 2022, the court ordered that a $9,450 deposit be paid for the transcripts and said that if this was not done within 14 days, the request for a transcript would be deemed withdrawn. Mother apparently did not pay the transcript deposit as ordered but paid $5 on February 9, 2022, for a compact disc of the hearings.

{¶ 16} In the meantime, Mother's counsel filed a motion on February 7, 2022, asking to withdraw because Mother had not retained counsel on any further matters and said she was retaining other counsel. On the same day, Father filed a motion to terminate visitation, based on the fact that Mother had declined visitation with A.Z. on February 2, 4, 5, and 6, 2022. According to the motion, Mother told A.Z. that she would not be exercising her parenting time "until there is a decision from a court that is workable, as of now the magistrate has made it impossible for you to be in our home as a family." In addition, Father filed a motion seeking an order that Mother provide an insurance card for A.Z., which had been sought for some time so that A.Z. could be scheduled for counseling.

{¶ 17} An entry filed on February 9, 2022, indicated that Mother had failed to appear for a February 8, 2022 hearing and had said she would not be appearing further pending a decision on her objections. The court ordered Mother to furnish an insurance

card within 24 hours and set a new hearing for February 17, 2022, on the pending motions, including counsel's motion to withdraw.

**{¶ 18}** The February 17, 2022 hearing was continued, since Mother was obtaining new counsel. Mother did not object to the magistrate's decision on the insurance card; as a result, the court filed an order on February 24, 2022, giving Mother 24 hours to turn over a copy of the card. Father then filed a contempt motion on March 2, 2022, noting that Mother had said in a text that A.Z. had been removed from the insurance plan offered by her husband's employer. A hearing on that matter was set for April 13, 2022.

**{¶ 19}** New counsel entered an appearance for Mother on February 24, 2022. Transcripts of the final custody hearings were then filed on March 2, 2022. On March 14, 2022, Mother filed a motion for leave of court to supplement her objections to the magistrate's decision. On March 16, 2022, the trial court filed a judgment entry overruling Mother's objections to the magistrate's decision and named Father legal custodian and residential parent for A.Z. The court also overruled Mother's request to file supplemental objections, "given the paucity of the general, nonspecific nature of her objections." Judgment Entry (Mar. 16, 2022), p. 2. Mother appeals from the trial court's judgment.

## II. Discussion

**{¶ 20}** As noted, Mother has not asserted a specific assignment of error. From reading her brief, we assume her assignment of error is that the magistrate's decision awarding custody to Father was an abuse of discretion. The alleged abuses include: (1)

the magistrate's acceptance of A.Z.'s testimony despite inconsistencies; (2) the magistrate's rejection of the opinion of Mother's alienation expert, Dr. Palumbo; (3) the magistrate's (and judge's) mischaracterization of Mother's mental health, contrary to Dr. Palumbo's assessment; (4) the misstatement that Mother has "drug struggles"; (5) the magistrate's finding that the GAL was not "credible"; and (6) the magistrate's (and judge's) reliance on the testimony of a Children Services' caseworker who found A.Z.'s claims credible.

{¶ 21} Before discussing these points, we note that, under Juv.R. 40(D)(3)(b)(iii), "[i]f a party files timely objections prior to the date on which a transcript is prepared, the party may seek leave of court to supplement the objections." The trial court denied Mother's request to supplement her objections. However, Mother failed to raise any error on appeal concerning the trial court's rejection of her request.

{¶ 22} App.R. 12(b) requires an appellate court to decide an appeal "on its merits on the assignments of error set forth in the briefs under App.R. 16." In turn, App.R. 16 requires appellants to include in their briefs "[a] statement of the assignments of error presented for review, with reference to the place in the record where each error is reflected," as well as "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." App.R. 16(A)(3) and (7). The law is well-settled that appellate courts " 'will not address underdeveloped arguments that an appellant fails to separately assign as error.' " *State v. Franks*, 2017-Ohio-7045, 95 N.E.3d 773, ¶ 12 (9th Dist.), quoting

*State v. Miller*, 9th Dist. Summit No. 25200, 2010-Ohio-3580, ¶ 7. Here, Mother did not even make an undeveloped argument about supplementing her objections; she made no argument at all. Accordingly, we will not consider the issue of supplementation.

**{¶ 23}** Juv.R. 40(D)(3)(b)(ii) further states that "[a]n objection to a magistrate's decision shall be specific and state with particularity all grounds for objection." " 'Courts have held that general objections do not meet [the Juv.R. 40(D)] standard.' * * *. A general objection, then, that alleges no particular error is effectively no objection at all." *In re N.M.*, 2d Dist. Montgomery No. 26469, 2015-Ohio-2180, ¶ 8, quoting *Ramsey v. Ramsey*, 7th Dist. Jefferson No. 13 JE 17, 2014-Ohio-1227, ¶ 16. In this situation, we review for plain error only. *Id.*, citing *In re H.B.*, 2d Dist. Montgomery No. 21365, 2006-Ohio-2124, ¶ 13. *See also* Juv.R. 40(D)(3)(b)(iv) ("Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Juv.R. 40(D)(3)(a)(ii), unless the party has objected to that finding or conclusion as required by Juv.R. 40(D)(3)(b).").

**{¶ 24}** Mother's objections in the trial court were very general, making only such assertions as there were improper findings of fact and conclusions of law and that the magistrate's decision was an abuse of discretion. Therefore, plain error review is appropriate here. "In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the

legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997), syllabus. After reviewing this matter, we find no plain error that would warrant a reversal of the trial court's decision. We also find no error.

## A. Custody Standards

{¶ 25} As pertinent here, R.C. 3109.04(E)(1)(a) states that:

The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies:

* * *

(iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.

{¶ 26} "Modification of a prior decree, pursuant to R.C. 3109.04(E)(1)(a), may only be made 'based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances

of the child, the child's residential parent, or either of the parents subject to shared parenting decree, and that the modification is necessary to serve the best interest of the child.' This is a high standard, as a 'change' must have occurred in the life of the child or the parent before the court will consider whether the current designation of residential parent and legal custodian should be altered." *Fisher v. Hasenjager*, 116 Ohio St.3d 53, 2007-Ohio-5589, 876 N.E.2d 546, ¶ 33. *Accord Gessner v. Gessner*, 2d Dist. Miami No. 2017-CA-6, 2017-Ohio-7514, ¶ 28.

{¶ 27} " 'The clear intent of [R.C. 3109.04(E)(1)(a)] is to spare children from a constant tug of war between their parents who would file a motion for change of custody each time the parent out of custody thought he or she could provide the child a "better" environment. The statute is an attempt to provide some stability to the custodial status of the children, even though the parent out of custody may be able to prove that he or she can provide a better environment.' " *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1977), quoting *Wyss v. Wyss*, 3 Ohio App.3d 412, 416, 445 N.E.2d 1153 (1982).

{¶ 28} In deciding that a change of custody was warranted, the magistrate concluded that a change of circumstances had occurred "based on [the] totality of circumstances, including but not limited to mother getting married, mother having another child, as well as all of the allegations by child that mother denies." Magistrate's Decision (Jan. 24, 2022), at p. 23. After making these findings, the magistrate addressed factors pertaining to A.Z.'s best interest and found that granting custody to Father was in the child's best interest. *Id.* at p. 23-29.

{¶ 29} The relevant factors for this analysis are found in R.C. 3109.04(F)(1), which provides that:

In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support

payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

* * *

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court.

{¶ 30} With these standards and factors in mind, we will consider Mother's arguments and whether the trial court committed plain error.

### B. Acceptance of A.Z.'s Testimony

{¶ 31} Much of Mother's argument is devoted to the claim that A.Z.'s story was not credible and that Mother's account of events should have been believed because she was "equally as credible." Appellant's Brief, p. 10.

{¶ 32} In *Davis*, the Supreme Court of Ohio stressed that the reason for deferential review in custody cases "is that the trial judge has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis*, 77 Ohio St.3d at 418, 674 N.E.2d 1159. The court further remarked that " '[a] reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not.' " *Id.* at 419, quoting *Seasons Coal Co. v. City of Cleveland*, 10 Ohio St.3d 77, 81, 461 N.E.2d 1273

(1984).

{¶ 33} This custody case began in 2018 and ended in 2022, more than four years later. It involved many motions and hearings as well as magistrate's decisions that the trial court reviewed and decided after objections had been filed. As a result, both the magistrate and trial court were well familiar with the parties and facts of the case. The magistrate's decision was 35 pages long and considered the testimony and relevant factors in great detail.

{¶ 34} Furthermore, while the parties had filed an agreed entry giving Mother custody in August 2019 (and the court did not generally allow testimony about events before that date), a number of troubling events occurred after the agreed order. As noted, A.Z. alleged in December 2019 that Mother had slapped her. In addition, Father's motion alleged that Mother had expressed suicidal and harmful ideations during a car ride after learning that A.Z. had seen a video on Mother's phone that showed Mother masturbating.

{¶ 35} After restricting Mother's visitation on an ex parte basis, the magistrate heard evidence (including A.Z.'s testimony) at a "continuing effects hearing" and then found A.Z. was credible about the slap and the events during the car ride. Magistrate's Order (June 2, 2020), at p. 4. The magistrate noted that A.Z. had not wavered in her claim and that the lack of a slap mark was not persuasive. *Id.* Additionally, the magistrate remarked that Mother's "answer as to whether she did slap [A.Z.] was not 'no,' but something to the effect that she would not want to interfere with her teaching which is her bread and butter. An interesting way of not answering the question." *Id.*

**{¶ 36}** The magistrate also remarked that A.Z. did not waver in her description of events in the car and that Mother was visibly shaking to the point that her own mother (also present in the car) kept telling Mother to calm down. *Id.* at p. 5. Furthermore, the magistrate found that the maternal grandmother lacked credibility and was of no help in determining what happened in the car as far as suicidal threats, because she was so protective of Mother. *Id.* The trial court rejected Mother's objections to the decision in September 2020 and adopted the temporary orders giving Father temporary custody.

**{¶ 37}** Further problems occurred in December 2020 with what Mother references as "The Hotel Allegation." A.Z. reported that she had witnessed her mother and T.D. engaging in sexual intercourse in a hotel room while A.Z. and another minor child were present. A.Z. testified about these matters during a February 25, 2021 hearing on Father's motion to modify or terminate visitation and during the final custody hearings held later that year. At the custody hearings, the magistrate also heard testimony from the original caseworker, Marissa Clark, who conducted a forensic interview with A.Z.

**{¶ 38}** In the initial decision restricting Mother's visitation, the magistrate found A.Z. "very credible" given the level of detail she supplied, and also found Clark credible. Magistrate's Decision (Mar. 1, 2021), p. 5. Again, the trial court reviewed the matter after Mother objected, expressed concern over the trauma to which A.Z. was being exposed, and agreed that Mother's parenting time should be restricted in order to protect the child. Trial Court Order (May 5, 2021).

**{¶ 39}** According to Clark, who was a certified forensic interviewer, A.Z. reported seeing Mother and T.D. engaging in oral sex in the hotel room within a few feet of A.Z.

September 21, 2021 Hearing Transcript ("Tr. 1"), p. 167. A.Z. also described being forced to go with Mother to homes of other men and hearing sexual activity. *Id.* at p. 168.

{¶ 40} Clark and the investigating officer believed A.Z.'s account, and Clark felt that A.Z.'s disclosure was very strong and was very reliable. *Id.* at p. 169 and 186. However, when Clark contacted Mother about the allegations, Mother refused to cooperate. Clark had a less than five-minute conversation with Mother and was referred to Mother's attorney. In addition, T.D. refused to cooperate, referred Clark to Mother's attorney, and refused to let her speak with his daughter, who was the other minor alleged to have been in the hotel room. *Id.* at p. 171-172 and 174.

{¶ 41} Clark gave her supervisor a disposition about the charges as substantiated, but Mother and T.D. subsequently objected to Clark's findings, even though they had not cooperated. While Clark was off work on medical leave, her supervisor changed the disposition to unsubstantiated due to incomplete paperwork. *Id.* at p. 190-192, and Nov. 22, 2021 Hearing Transcript ("Tr. 6"), p. 37, 39, and 40. Part of the reason the paperwork was incomplete was because there were no interviews of Mother or the other minor child. Tr. 6 at p. 40. The failure to substantiate the allegations did not mean that A.Z. was not telling the truth; it was just that there were three other people who would not cooperate and give interviews to the caseworker. *Id.* at p. 44.

{¶ 42} According to Mother, the magistrate incorrectly stated in his final custody decision that " 'Clark was credible when discussing the interaction with Mother in that Mother did not deny the sexual activity.' " Mother argues that Clark, instead, had said

that Mother denied A.Z.'s allegations. Appellant's Brief at p. 8. However, what Clark actually said was that on the phone, Mother had denied the allegations, "and then made a comment that if she were to do that, it's not against the law if they're sleeping. Like it's not a problem if kids are sleeping and she's doing that." Tr. 6 at p. 220.

{¶ 43} Furthermore, in the same decision, the magistrate noted Clark's testimony that when she called Mother about the allegations, Mother said, " 'It's not [a] crime to do stuff with your boyfriend" and that she thought the kids were sleeping; she also said that when A.Z. asked her to stop, they stopped because she "didn't know that [A.Z.] was awake.' " Magistrate's Decision (Jan. 24, 2022), at p. 7. These comments were similar to what the magistrate had previously said in the decision issued after hearing testimony about the December 2020 hotel incident. *See* Magistrate's Decision (March 1, 2021), at p. 3. They were also consistent with Clark's testimony about the hotel incident during the February 25, 2021 hearing. *See* Exhibit AAA (Feb. 25, 2021 Hearing Tr.), p. 49.

{¶ 44} Notably, the magistrate stated in the final custody decision that he had looked at testimony from the continuing effects hearings as well as the February 25, 2021 motion hearing. *See* Jan. 24, 2022 Decision at p. 3. The decision further noted Clark's statement that "Mother was upset during the conversation and at no time ever told her that none of it happened." *Id.* at p. 7. This was based on Clark's testimony during the February 25, 2021 hearing and correctly summarized the testimony. *Id.* *See also* Ex. AAA at p. 50.

{¶ 45} In addition, matters that Mother presented as inconsistencies in A.Z.'s testimony were either insignificant or were based on differences between what A.Z. said

she saw and what others may have said. For example, Mother repeatedly said A.Z. was not telling the truth about the allegations she made. This was not an inconsistency in A.Z.'s testimony; it was a credibility issue for a fact-finder to resolve.

**{¶ 46}** As another example, A.Z. testified that the other child in the room (A.D.) was asleep when the sexual events occurred, even though A.Z. made a few attempts to rouse her. Nov. 11, 2021 Hearing Tr. ("Tr. 5"), p. 217 and 220. In contrast, A.D. apparently told Mother's alienation expert (with whom she was allowed to speak) that she was the last person to fall asleep. Appellant's Brief at p. 8. *See also* Oct. 6, 2021 Hearing Tr. ("Tr. 2"), p. 57. This was not an inconsistency in A.Z.'s testimony; it was a difference in the statements of two people. A.D. also did not testify at trial and the court had no chance to assess her credibility.

**{¶ 47}** Similarly, Mother asserts that A.Z.'s account was not credible because the hotel room was too dark to see anything. A.Z. pointed out that while the lights in the room were off, only the lighter curtains were drawn and lights from the parking lot provided enough light to be able to see. Tr. 5 at p. 217-218. In contrast, T.D. testified that the lights in the parking lot did not illuminate the room. October 27, 2021 Hearing Tr. ("Tr. 4"), p. 173. T.D. also submitted a video of the hotel room, which he made in June 2021 to show what the hotel room looked like in the dark. *Id.* at p. 174 and 190-191, and Defendant's Ex. B1.

**{¶ 48}** Again, the trial court was in the best position to evaluate credibility, having had an opportunity to see and hear the witnesses, and we cannot substitute our judgment. Moreover, our review of the record indicates that Mother had difficulty answering even

simple questions with direct answers and much of her testimony appeared to lack credibility. Therefore, there was no plain error in the trial court's decision in this regard that would present a basis for reversal. There was also no error.

## C. Dr. Palumbo's Testimony

{¶ 49} Mother further contends that the magistrate erred in disregarding the testimony of Dr. Palumbo, who was an expert in parental alienation. Mother contends that the magistrate misstated the doctor's testimony to enhance the credibility of Father and A.Z. and to discredit Mother and Dr. Palumbo. The magistrate rejected Dr. Palumbo's opinion because it was based on the conclusion that A.Z. was not credible, when, in fact, the magistrate had found A.Z. credible and had also found that the things A.Z. alleged had happened. Magistrate's Decision (Jan. 24, 2022), at p. 10. The magistrate also noted that the spreading of animosity to A.Z.'s grandparents was not surprising, since the maternal grandmother had been present during at least one incident that the court found had occurred, and she had supported Mother's version of events. *Id.* In addition, A.Z. had seen text messages between Mother and grandmother in which they had discussed ways to upset A.Z. in order to bolster the parental alienation claim.

{¶ 50} " 'In its role as fact finder, a trial court may choose to believe or disbelieve any witness, including an expert witness.' " *Marinella v. Marinella*, 2d Dist. Montgomery No. 25449, 2013-Ohio-2932, ¶ 12, quoting *H.R. v. L.R.*, 181 Ohio App.3d 837, 2009-Ohio-1665, 911 N.E.2d 321, ¶ 15 (10th Dist.). "However, 'expert opinion "may not be arbitrarily ignored, and some reason must be objectively present for ignoring expert opinion

testimony." ' " *H.R.* at ¶ 15, quoting *State v. White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905, ¶ 71.   (Other citation omitted.)

{¶ 51} In the case before us, the magistrate's reason for rejecting Dr. Palumbo's testimony was supported by the evidence.   As noted, Mother's testimony lacked credibility, and the magistrate found A.Z.'s account credible.   Dr. Palumbo also stated that much of the factual part of his report was based on his interview with A.Z. (MOTHER??)   Tr. 2 at p. 67.

{¶ 52} In addition, there were other objective reasons to reject Dr. Palumbo's testimony.   Dr. Palumbo was retained by Mother as a parental alienation expert.   The first expert that Mother hired (who died during the case) found parental alienation after talking only to Mother and no one else.   Tr. 1 at p. 17; Tr. 2 at p. 147-148.

{¶ 53} While parties are certainly free to retain experts to support their claims, the trial court could have reasonably concluded that the first doctor did not adequately investigate, nor did Dr. Palumbo.   Dr. Palumbo interviewed A.Z., Mother, T.D., T.D.'s two children, the maternal grandparents, Mother's therapist, the GAL, and Father.   *Id.* at p. 41.   *See also* Tr. 1 at p. 38.   Seven of these people would have been inherently favorable to Mother; Father was the only interviewee on his side.   Dr. Palumbo gave no weight to that fact.   Tr. 2 at p. 103.

{¶ 54} Moreover, while Dr. Palumbo said that he gave Father the option of having interviews done with anyone he wished, he also claimed that Father did not ask him to interview anyone else, including Father's partner, Tami, the Children's Services' caseworker (Clark), and T.D.'s ex-wife.   *Id.* at p. 42 and Oct. 12, 2021 Hearing Tr. ("Tr.

3"), p. 13-14.   This was contradicted by Father, by Tami, and by Father's attorney.   Tr. 3 at p. 12-13; Tr. 2 at p. 99; Tr. 5 at p. 27; and Nov. 23, 2021 Hearing Tr. ("Tr. 7"), p. 44. Tami indicated that Dr. Palumbo was asked to talk to those three people as well as A.Z.'s school counselor and A.Z.'s therapist.   Tr. 5 at p. 26-28.

{¶ 55} Having met with A.Z. only once, and for less than 30 minutes, Dr. Palumbo described her allegations against Mother as "absurd and ridiculous."   Tr. 2 at p. 47; Tr. 5 at p. 211.   Dr. Palumbo even spent significantly less time with A.Z., the most important individual in the case, than he did with her maternal grandmother, whom he interviewed for an hour and a half.   Tr. 3 at p. 106.

{¶ 56} Dr. Palumbo also did not review the forensic tape of the hotel sex incident but concluded, without watching it, that A.Z.'s statements to the investigator were not credible "on their face."   *Id*. at p. 66.   In addition, no matter what information was brought to his attention concerning Mother's misstatements or misrepresentations, prior domestic violence with her own parents, discussion with her mother on how to establish parental alienation, attempts to tell her parents how to testify in court; prior mental health history, including being on disability for a "mood disorder," being diagnosed as schizophrenic, and having received drug treatment, Dr. Palumbo repeatedly indicated that essentially nothing that he heard would affect his opinion.   *See* Tr. 2 at p. 117, 139-140, 156-157, 162-163, 167, 169, 187-188, and 192-193; Tr. 3 at p. 7 and 30-32.   While Dr. Palumbo stated at times that certain things might "concern" him, such as Mother's past difficulty with drugs, he never indicated that any of these matters would affect or change his opinion.   *E.g.*, Tr. 3 at p. 36.

{¶ 57} The same thing was true concerning information about T.D., including that T.D.'s relationship with his ex-wife was not "amicable," as Dr. Palumbo had reported; that T.D. had been found lacking in credibility in post-decree divorce proceedings with his ex-wife; that T.D. had been involved in multiple domestic violence situations with his ex-wife; and that T.D. had made threats while Mother was with A.Z. and had her phone on speaker so that A.Z. was able to hear. These comments included that he would "bash in the faces" of A.Z. and her family (Father and Tami) and that A.Z. was a "f*cking psycho." Tr. 2 at p. 110-112, 129-130, 132, and 184-185; Tr. 3 at p. 30-32 and 43. Dr. Palumbo's comment about this last disturbing incident was that, while it was "not appropriate," he could not say that T.D. was threatening A.Z. Tr. 2 at p. 132, and Tr. 3 at p. 43. To the doctor, "It just sounded like [T.D.] was very frustrated and verbally exploding." *Id.* at p. 43.

{¶ 58} Mother points out that Dr. Palumbo found her to be "completely honest" based on an MMPI test and that he had no concerns about her mental health based on his experience and discussions with Mother and her former therapist. Appellant's Brief at p. 13. *See also* Tr. 2 at p. 59, 74-75, and 116. Mother therefore argues that Dr. Palumbo's opinion was not only a result of his conclusion that A.Z. was not credible. Mother further argues that the magistrate and judge had conjured up their own conclusions about her mental health.

{¶ 59} As indicated, a fact-finder is free to reject expert opinion. The record here is replete with evidence of Mother's mental health issues, ranging from two suicide attempts, diagnoses of schizophrenia, bipolar disorder, and depression, treatment at

Dayton Recovery Center and long-term use of Suboxone, receipt of Social Security disability benefits for a number of years because of a mood or personality disorder and reapplication for disability benefits thereafter, the fact that Mother's parents attempted to take custody from her, and that Mother committed domestic violence against her own mother. Tr. 1 at p. 21-22, 25, 28, and 29-30; Tr. 2 at p. 116, 138, 139, and 166; Tr. 3 at p. 5, 23, 30, 33-34, 36, and 118; Tr. 5 at p. 8-9; and Tr. 7 at p. 241.

{¶ 60} Although Dr. Palumbo gave Mother a psychological bill of good health, his report did not address Mother's major psychiatric and mood disorders or her disability. Tr. 2 at p. 144. In fact, Dr. Palumbo indicated that he did not put stock in a psychiatric diagnosis from someone he did not know. *Id.* at p. 139. Dr. Palumbo also discounted Mother's 2013 domestic violence against her own mother because there was no conviction. Tr. 3 at p. 26. He commented that he viewed it as "more of a mental health issue, that she was going through emotional issues that had parental involvement in it she had to work through." *Id.*

{¶ 61} In view of the preceding discussion, we find no plain error in the trial court's rejection of Dr. Palumbo's opinion and evaluation, and we do not find that the court misstated the testimony. There was also no error.

### D. Testimony of the GAL

{¶ 62} Mother's next point is that the court erred in finding that the GAL was not credible, and again she contends that the court's discussion was based on mischaracterizations and misstatements. The magistrate said that he did not agree with

the GAL's findings (which were that Mother should receive custody of A.Z.) and articulated various ways in which it disagreed with the GAL's assessment of the evidence. Magistrate's Decision (Jan. 24, 2022), p. 11-12. Again, we review only for plain error. *N.M.*, 2d Dist. Montgomery No. 26469, 2015-Ohio-2180, at ¶ 8.

**{¶ 63}** As a general rule, a guardian ad litem's role "is to investigate the ward's situation and then to ask the court to do what the guardian feels is in the ward's best interest." *In re Baby Girl Baxter*, 17 Ohio St.3d 229, 232, 479 N.E.2d 257 (1985). However, " '[a] trial court is not bound to follow a guardian ad litem's recommendation.' " *Bomberger-Cronin v. Cronin*, 2d Dist. Greene No. 2014-CA-4, 2014-Ohio-2302, ¶ 27, quoting *Lumley v. Lumley*, 10th Dist. Franklin No. 09AP-556, 2009-Ohio-6992, ¶ 46.

**{¶ 64}** "As the fact finder, the trial court determines the guardian ad litem's credibility and the weight to be given to the guardian ad litem's recommendation." *Id.* " 'Because assessment of the credibility and weight of the evidence is reserved for the trial court, we will not second guess the court's decision to disregard the guardian ad litem's recommendation.' " *Id.*, quoting *Davis*, 77 Ohio St.3d at 419, 674 N.E.2d 1159. As we have said, the trial court had dealt with this case for a number of years; the court was also very familiar with the GAL and her reports and involvement in the case.

**{¶ 65}** Although Mother's discussion on this point is confusing, she implies that the magistrate improperly criticized the GAL for being less concerned about Mother's drug struggles than Father's drug struggles. It was the duty of the magistrate to assess and weigh the GAL's memory and interpretation of the facts.

**{¶ 66}** During trial, the GAL testified that she did not recall A.Z. telling her that she

had observed Mother buying and selling drugs. November 22, 2021 Hearing Tr. ("Tr. 6"), p. 150. The magistrate's decision correctly noted this. Magistrate's Decision (Jan. 24, 2022), at p. 11. Mother argues that the GAL "probed further to get the underlying facts, but * * * stated that '[A.Z.] really didn't know what she was concerned about necessarily, there really weren't facts that supported that.' " Appellant's Brief at p. 15, quoting the GAL, Tr. 6 at p. 154.

{¶ 67} The evidence indicates that A.Z. had told the GAL around August 2019 that she had personally witnessed Mother buying and selling drugs and that Father told the GAL about this as well. Tr. 5 at p. 43 and Tr. 7 at p. 51. Exhibits of text messages were also submitted indicating that Mother was seeking to purchase Adderall and to sell Suboxone strips when she was on Suboxone. *See* Plaintiff's Ex. 8 and 9. In addition, A.Z. testified during a final custody hearing that she told the GAL that she had seen Mother using illegal drugs. Tr. 6 at p. 140. The magistrate was free to find this evidence inconsistent with the GAL's testimony that she did not recall A.Z. telling her that Mother had been buying and selling drugs. *See* Tr. 5 at p. 150. Thus, the magistrate did not commit plain error in disagreeing with the GAL's conclusions.

{¶ 68} It was within the province of the magistrate to consider that, like Dr. Palumbo, the GAL appeared to give less weight to some negative information about Mother and T.D. than what the magistrate found appropriate. The magistrate was free to disagree with the GAL when she indicated that she placed equal relevance on Mother's failure to disclose that she had been treated for years with Suboxone for an addiction as

she did on father's failure to disclose a prescription medicine. *Id.* at p. 169.[1] The magistrate did not commit error or plain error by disagreeing with the GAL's conclusion that these situations were "on par." Magistrate's Decision (Jan. 24, 2022), at p. 12.

{¶ 69} Furthermore, the GAL also said that if all the facts concerning T.D.'s domestic violence against his ex-wife and T.D.'s threats to Father, Tami, and A.Z. were true (bashing in their heads and calling A.Z. a "f*cking psycho"), the GAL would not have a difference of opinion. Tr. 6 at p. 181-182. Again, the magistrate was permitted to disagree with the GAL.

{¶ 70} Accordingly, we find no plain error nor any error in the decision to reject the GAL's recommendations.

### E. Testimony of Marissa Clark

{¶ 71} Mother's final argument concerns Marissa Clark, the caseworker who investigated the hotel incident as well as suicidal thoughts that A.Z. was having in April 2021. According to Mother, the court incorrectly relied on Clark's testimony, which was based on A.Z.'s statements and many "unsubstantiated claims." Appellant's Brief at p. 18.

{¶ 72} We have already discussed the hotel incident. As to A.Z.'s suicidal thoughts, Father and Tami received a call in April 2021 from a school counselor due to an alleged incident in which A.Z. was talking about cutting herself. Tr. 5 at p. 19; Tr. 7

---

[1] Father tested positive for amphetamines in June 2021, as an apparent result of a false positive result is caused by a prescription he had for weight control. Tr. 5 at p. 39-40 and 117 and Ex. 30; Tr. 6 at p. 6, 8, and 10; Tr. 7 at p. 59-62. Father did not disclose this medication during discovery, because he was not on it at that time. Tr. 5 at p. 116.

at p. 58. They took A.Z. to her therapist that day. Tr. 5 at p. 19-20; Tr. 7 at p. 58.

{¶ 73} According to Clark, Children Services received a report in April 2021 of concerns about A.Z.'s mental health. A.Z. was having suicidal thoughts because of the way Mother was treating her. Tr. 1 at p. 162. Clark obviously did not identify who made the referral; it could have been made by a mandated reporter like the school counselor or A.Z.'s therapists. *See* R.C. 2151.421. Subsequently, Clark talked to A.Z., Father, Mother, and T.D. Tr. 1 at p. 163.

{¶ 74} During the interview, A.Z. told Clark the same thing that had been reported, i.e., that she was very unhappy at her mother's house and that she did have thoughts of harming herself because of the way her mother talked to her and treated her. *Id.* at p. 165. Ultimately, Clark found that the charge was not substantiated because it was emotional maltreatment, and she could not prove that Mother had emotionally or verbally abusing A.Z. solely based on her interview with A.Z. *Id.* at p. 166. Clark described it as a "he said, she said thing." *Id.* Furthermore, Clark was impacted by a psychologist (Dr. Palumbo), who did not report that A.Z. was having suicidal thoughts; he had reported instead that A.Z. was "fine." *Id.* at p. 163.

{¶ 75} At trial, A.Z. stated that Dr. Palumbo had asked her a question about whether she was having thoughts about harming herself, and she said no at the time because she was nervous and did not know what to say because she did not really like talking about that. Tr. 5 at 211. A.Z. said everything she had told Dr. Palumbo was true except this. In fact, at the time, A.Z. was actually thinking about harming herself. However, the counseling she had helped. *Id.* at p. 211.

{¶ 76} Dr. Palumbo's interview with A.Z. occurred in May 2021, not too long after the school incident. Tr. 2 at p. 39. As noted, Dr. Palumbo did not talk with the school counselor, A.Z.'s therapist, or Clark. He was also unaware that A.Z. had reported feeling suicidal at school a few weeks before their interview. *Id.* at p. 48.

{¶ 77} Contrary to Mother's claims, Clark's conclusions were not based simply on A.Z.'s statements and unsubstantiated claims. An incident obviously did occur at school which caused a counselor to call Father and caused Father to immediately take A.Z. to her therapist. The fact that the agency did not substantiate the charge did not mean that A.Z.'s statements were untrue.

{¶ 78} The Ohio Administrative Code contains definitions that specifically apply to Children Services investigations. An "allegation" is defined as "a described set of circumstances which asserts the occurrence of child abuse, neglect, or dependency." Ohio Adm.Code 5101:2-1-01(B)(18). A "case disposition" "means the determination of whether or not abuse or neglect has occurred or is occurring." Ohio Adm.Code 5101:2-1-01(B)(46). In addition, case report dispositions are ranked in six categories, with "substantiated" being the highest and "unable to locate" being the lowest. *Id.* at 1-01(B)(46)(a)-(f).

{¶ 79} " 'Substantiated report' means the report disposition in which there is an admission of child abuse or neglect by the person(s) responsible; an adjudication of child abuse or neglect; or other forms of confirmation deemed valid by the PCSA." Ohio Adm.Code 5101:2-1-01(B)(310. " 'Unsubstantiated report' means the report disposition in which the assessment/ investigation determined no occurrence of child abuse or

neglect." Ohio Adm.Code 5101:2-1-01(B)(341). "Neglected child" and "abused child" have special statutory definitions and statutory procedures govern what agencies must do when receiving referrals concerning alleged abuse or neglect. See R.C. 2151.03; R.C. 2151.031; R.C. 2151.421(E)(2), (G), and (H). Charging a parent with neglect or child abuse (and invoking the machinery of the State, which can lead to serious consequences like termination of parental rights) is something that agencies would approach with a good degree of caution. Again, the fact that an agency was unable to substantiate an allegation, particularly in cases where parties gave conflicting accounts, would not mean that an incident did not happen.

{¶ 80} From Clark's testimony, it is clear that she believed A.Z.'s allegations, both as to the hotel incident and as to the fact that A.Z. was unhappy and thought of harming herself at times. In fact, Clark said so. Tr. 1 at p. 169, 189, and 193. As we have stressed, the trial court was in the best position to determine the credibility of the witnesses.

{¶ 81} As another reason for rejecting Clark's testimony, Mother cites the fact that Clark's supervisor "questioned her methodology in conducting forensic interviews." Appellant's Brief at p. 18. Clark's supervisor stated that Clark's interviewing techniques were not the same as what she would do, but she did not "think necessarily that it was incorrect." Tr. 6 at 47.

{¶ 82} Clark had a bachelor's degree in psychology and a masters' degree in social work. She was also a certified forensic interviewer for sex abuse and physical abuse cases who had handled more than 100 sex abuse cases. Tr. 1 at 157-158. Again, the

trial court had an opportunity to see and hear these witnesses and judge their credibility. We cannot substitute our judgment. Having reviewed the record, we find no plain error, nor any error.

{¶ 83} Accordingly, Mother's assignment of error is overruled.

## III. Conclusion

{¶ 84} Mother's sole assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

TUCKER, P.J. and DONOVAN, J., concur.

Copies sent to:

Tom O. Merritt
Phillip D. Hoover
Kathryn Maher Huffman, GAL
Hon. Scott Altenburger