[Cite as *State v. McBride*, 2023-Ohio-16.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-200443 |
| | | TRIAL NO. B-1900691 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| DAVID MCBRIDE, | : | |
| Defendant-Appellant. | : | |


Criminal Appeal From:   Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: Jaunary 6, 2023


*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Mary Stier*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Joshua A. Thompson* and *Jessica Moss*, Assistant Public Defenders, for Defendant-Appellant.

**MYERS, PRESIDING JUDGE.**

{¶1}   This appeal concerns R.C. 2152.12(B), Ohio's discretionary-bindover statute.  We are asked to determine the standard of proof necessary to support a juvenile court's determination under R.C. 2152.12(B) that a child is not amenable to rehabilitation in the juvenile system as well as which party bears the burden of proof regarding a child's amenability to treatment.

{¶2}   Defendant-appellant David McBride appeals the trial court's judgment convicting him, following a discretionary bindover from the juvenile court, of the offenses of rape, attempted rape, public indecency, and burglary.  McBride argues that R.C. 2152.12(B) provides no standard of review for an appellate court to use when reviewing the juvenile court's determination that a child is not amenable to rehabilitation within the juvenile system, nor does it address which party bears the burden of proof concerning a child's amenability to treatment.  He urges this court to hold that a juvenile court's amenability determination must be supported by clear and convincing evidence and that the state bears the burden of proof regarding amenability.

{¶3}   Both of these arguments were squarely addressed and rejected by the Supreme Court of Ohio in *State v. Nicholas*, Slip Opinion No. 2022-Ohio-4276.  We follow *Nicholas* and hold that a juvenile court's amenability determination must be supported by a preponderance of the evidence, rather than clear and convincing evidence, and that while the state bears the burden of persuasion regarding a child's amenability to treatment in the juvenile system, it is not required to produce affirmative evidence of nonamenability.

{¶4}   We further find no merit to McBride's additional argument that the juvenile court abused its discretion when it found that he was not amenable to treatment in the juvenile system and transferred jurisdiction of his charges to the court of common pleas, and we affirm the trial court's judgment.

### *McBride's Crime Spree and Bindover*

{¶5} On July 19, 2018, McBride, who was then 15 years old, was terminated from a period of probation that he had been serving for his adjudication as a delinquent for the offense of gross sexual imposition. On that same day, as well as on July 23, 2018, McBride committed a series of offenses that resulted in the state filing complaints in juvenile court charging him with acts which, if committed by an adult, would have constituted the offenses of rape, attempted rape, kidnapping, and burglary. With the exception of the complaint for burglary, each complaint additionally alleged two firearm specifications.

{¶6} The state filed a motion for relinquishment of jurisdiction as to all charges, which were subject to discretionary, rather than mandatory, transfer. The juvenile court held a hearing to determine whether there was probable cause that McBride committed the charged offenses.

### *A. Probable-Cause Hearing*

{¶7} At the probable-cause hearing, Cincinnati Police Detective Charlene Morton testified that she investigated a series of sexual offenses that occurred on July 19, 2018. Morton first investigated an offense of public indecency that occurred around 4:30 in the afternoon, in which the suspect had approached a postal worker while she was inside her vehicle. The suspect exposed himself, masturbated, and asked the victim to perform oral sex on him. After the postal worker locked herself inside the vehicle and called 911, the suspect fled.

{¶8} Morton also investigated an incident that occurred approximately one hour later that same day. In that incident, the victim, M.H., witnessed the suspect fondling himself in the parking lot of M.H.'s mother's apartment complex while she was taking out the trash for her mother. The suspect approached M.H. with a gun in

3

his hands, pointed the weapon at her head, pulled down his pants and exposed his penis, and demanded that she perform oral sex on him. Terrified, M.H. complied with the suspect's demand and began to perform the sexual act. The act was interrupted by another resident of the apartment complex, who yelled at the suspect, causing him to flee.

{¶9} Morton last testified about an attempted rape that she investigated later that same night that occurred in the same parking lot as the attack on M.H. In that incident, the suspect approached the victim, S.S., as she exited from her vehicle. He pointed a gun at her and demanded that she get back in her car. S.S. complied, and once they were both in the car, the suspect exposed his penis and demanded that S.S. perform oral sex on him. S.S. refused to comply. She was able to knock the suspect's hand away and flee from the car.

{¶10} Through her investigation, Morton developed McBride as a suspect in these offenses.[1] She prepared a photographic lineup and showed it to all three victims and several witnesses. Neither the postal worker nor S.S. were able to make an identification. But M.H., as well as both the resident who interrupted the suspect's attack on her, and another witness, identified McBride in the lineup.

{¶11} Morton testified that McBride admitted his involvement in these offenses. He stated that the weapon used belonged to his sister, and that he had taken it from her bedroom. A weapon was retrieved following a search of McBride's sister's home, and McBride's DNA was found on the weapon.

{¶12} Cincinnati Police Detective Charles Zopfi also testified at the probable-cause hearing. Zopfi investigated an incident that occurred on July 23, 2018, at an apartment complex on Clarion Avenue in Cincinnati. While exiting from her vehicle in the parking lot of the apartment complex, the victim, T.B., witnessed a suspect

---

[1] McBride raises no challenge to the juvenile court's probable-cause determination in this appeal.

exposing himself and masturbating. T.B. entered her apartment building, and while she was attempting to unlock her door, the suspect approached her and grabbed her buttocks from behind. T.B. threatened to call the police, causing the suspect to flee. Detective Zopfi developed McBride as a suspect in this incident, and he prepared a photograph lineup to show to T.B. T.B. identified McBride in the lineup.

{¶13} Following the hearing, the juvenile court found probable cause that McBride had committed the charged offenses.

### B. Amenability Hearing

{¶14} The juvenile court subsequently conducted an amenability hearing to determine whether McBride was amenable to rehabilitation in the juvenile system.

{¶15} Several of the victims of McBride's offenses testified at the hearing. M.H. testified that she forgave McBride and that she wanted the court to take mercy on him. S.S. also asked the court to have mercy on McBride and testified that she did not want him to be tried as an adult. T.B. described the offenses that McBride committed against her. When asked by the juvenile court about the impact of those offenses, she stated, "And then at home I'm thinking, you know, this is a place for me to be safe and, you know, you never expect that someone would do that to you."

{¶16} Lieutenant Bill Smith with the Xavier University Police Department testified that McBride committed two acts of public indecency on Xavier's campus in 2016. The offenses committed by McBride at Xavier were not part of the current case, but the juvenile court allowed Smith to testify over McBride's objection.

{¶17} Detective Morton testified that she was concerned with the escalation of the offenses that she investigated. She explained that McBride's first offense against the postal worker involved him asking her for oral sex and exposing himself. McBride then approached M.H. with a weapon and forced her to perform oral sex on him. And

he last approached S.S., again with a weapon, and forced her into her vehicle while demanding that she perform oral sex on him. Detective Zopfi likewise testified regarding his concern about the escalating violence in McBride's offenses.

{¶18} McBride presented testimony from his sister Shanine Scott. Scott testified that the charged incidents were not typical of McBride's behavior throughout his life, and that "the sexual thing with himself" began to develop in the preceding two years when McBride began trying to figure out his sexual identity. Scott told the court that McBride had been bullied, but that he was not a confrontational person and never fought back. She also stated that he had watched pornography with a stepbrother and had a bus driver speak with him about masturbation, but that McBride had not acted out sexually after those experiences. Scott testified that McBride lived with his father in Indianapolis for one summer, and that she believed his "masturbation issues" started there.

{¶19} McBride presented what was essentially character testimony from both Denishea Goodman and Gregory Goodrum. Goodman testified that she was the best friend of McBride's sister and that she viewed McBride as a brother. In Goodman's opinion, McBride's family was not adept at dealing with emotions or conflicts, and McBride did not receive the attention he needed, resulting in him becoming stressed and experiencing depression.

{¶20} Goodrum testified that he taught McBride in both karate class and in the Order of Pythagorans, an organization that taught youths how to run meetings and taught them oratorical skills as well as math and physics skills. Goodrum testified that McBride was a shining star in the program and had moved through the chairs at both the local chapter and state level. He described McBride as shy, diligent, and smart. According to Goodrum, he noticed a change in McBride after McBride's mother married his stepfather, stating that the marriage, as well as going through puberty, "kind of changed him."

{¶21} McBride also presented testimony from two psychologists, Dr. Nicole Leisgang, a psychologist appointed by the court to evaluate McBride's amenability to treatment and rehabilitation in the juvenile system, and Dr. Richard Rothenberg, a psychologist retained by McBride for the same purpose.

{¶22} Leisgang testified that McBride presented as sad and overwhelmed. She felt that he at times attempted to highlight his emotional difficulty, which she explained was not uncommon in children. Leisgang was asked about her review of McBride's history, and she highlighted the following: that McBride had struggled socially in school with peer rejection and bullying; that he was potentially the victim of sexual abuse by his stepsister and physical abuse by his father; that McBride's parents were very willing to participate in services for him; and that McBride has suffered from depression and has a history of suicidal ideation.

{¶23} Leisgang administered several psychological tests to McBride, including the Malin Adolescent Clinical Inventory, the Adolescent Psychopathology Scale, and the Risk Sophistication Treatment Inventory ("RSTI"). While she acknowledged that these tests indicated that McBride was at a high risk for reoffending, she explained that a high risk of reoffending did not equate to a lack of amenability to services in the juvenile system.

{¶24} Leisgang issued a report opining that McBride was amenable to rehabilitation in the juvenile system. The reported stated that:

David's case is quite complicated. Within a very short time after completing a residential and transition program, he re-offended. In addition, there was a marked increase in the level of contact and violence, evidenced by the presence of a weapon. Records indicate that he allegedly victimized 4 women in less than one week (7/19 to 7/23). Further the RSTI and OYAS were respectively indicative of high and moderate risk of re-offending. An understanding of David is also quite

complex. He presents with significant emotional difficulty, although there is an element of exaggeration to it. Nonetheless, he has been complaint [sic] with medication while at the Youth Center. He also has had no behavioral incidents, suggesting that he can benefit from a structured and supervised setting. While he has been diagnosed with PTSD, his caretakers now question the incidents used to establish this diagnosis. While the issues are complex, it is my opinion, offered with a reasonable degree of psychological accuracy, that the preponderance of the evidence would suggest that given his young age and the services still available within the juvenile court system (e.g., DYS), David McBride is amenable to intervention.

{¶25} In support of her report, Leisgang testified that McBride presented with numerous factors indicating that he was amenable to treatment, including his significant emotional distress and the fact that he is bothered by his sexual urges. She stated that the juvenile system can offer individual and group counseling, psychotropic medication, and age-appropriate intervention, and that McBride, at the time of the hearing, had five and a half years to be rehabilitated in the juvenile system.

{¶26} Leisgang also testified that the RSTI she administered contained a Treatment Amenability Scale, and that McBride's score fell in the middle offender range of that scale. Leisgang's report identified several risk factors pertaining to McBride's treatment amenability, including "past/current severe psychopathology, ongoing behavior despite extensive treatment, and marginal acceptance of his own responsibility." But it also identified that McBride "scored low on other risks as he is open to and expects change," that he was distressed by his actions, and that he had positive attachments.

{¶27} On cross-examination, Leisgang was questioned about the statement in her report that McBride tended to exaggerate certain things about himself. She

8

stressed that McBride was highlighting, rather than malingering, and that he did so for an adaptive purpose because he was scared, rather than in an attempt to "con the system." Leisgang recognized that her report stated that "the pervasiveness of his comments raises concerns as to whether he was purposely trying to present himself in a negative light" and reflected that she had concerns that he was intentionally trying to highlight his difficulties. But she maintained that, as an adolescent, McBride was not attempting to engage in manipulation.

{¶28} Leisgang also acknowledged on cross-examination that McBride had previously received sexual-offender treatment at the Village Network, a residential treatment facility, that his discharge summary following that treatment indicated that he had developed sufficient coping skills to handle his issues, and that McBride committed several of the offenses with which he was currently charged on the day that he was terminated from probation for the offenses for which he had received the sexual-offender treatment at the Village Network. Leisgang testified that while the discharge summary may have been correct at the time it was written, the skills currently possessed by McBride were not sufficient for him to manage his stressors.

{¶29} Rothenberg also opined that McBride was amenable to rehabilitation in the juvenile system. He issued a report stating that "Although David is at a well above average risk of sexual recidivism it is my opinion offered with a reasonable degree of psychological accuracy, that the preponderance of the evidence would suggest that given his relatively young age and the services available within the juvenile justice system, David is amenable to treatment." The report further stated:

> David would benefit from participating in sex offender specific treatment. Based on his history and current risk and protective factors I believe David's least restrictive environment for treatment would be an inpatient residential facility, most likely the Ohio Department of Youth Services (DYS). He would likely benefit from participating in

both individual and group therapy. Treatment should focus on his ability to identify his risk factors related to his inappropriate sexual behavior and how to manage his sexual feelings in an appropriate manner when he does experience them. His treatment should also include basic sexual education, social skills development and a better understanding of the concept of consent in regards to sexual relationships and appropriate sexual boundaries.

{¶30} Rothenberg testified in accordance with his report, stating that the best treatment for McBride would be trauma-specific cognitive behavioral therapy, which he had not previously received. He opined that although McBride was chronologically almost 16 years old, he functioned at a much younger age both emotionally and psychologically.

{¶31} Rothenberg discussed the prior treatment that McBride had received at the Village Network, stating that McBride's progress in that treatment was slow and difficult, but that he made a significant amount of progress at the end of treatment. He stated that McBride's discharge papers reflected that there remained unresolved problems and that McBride needed to honestly address trauma symptoms and anxieties related to his family unit. Rothenberg also testified about the notes that he had reviewed from McBride's time at the Talbert House following his discharge from the Village Network. Those notes reflected that McBride lacked a good understanding of risk factors and of his relapse-prevention plan.

{¶32} Rothenberg testified that he had administered the Personality Assessment Inventory for Adolescents to McBride, and that the results of that test indicated that McBride was open to treatment and acknowledged that there were issues he needed to work on. Rothenberg's report discussed these test results and cautioned that "the nature of some of [McBride's] problems suggest that treatment would be fairly challenging with a difficult treatment process and the probability of

reversals." The report also stated that the test results reflected an element of exaggeration in complaints and problems. Rothenberg testified that the noted exaggerations were more a sign of distress than of malingering or feigning of symptoms.

**{¶33}** Rothenberg was questioned specifically on why he felt that McBride was amenable to rehabilitation in the juvenile system, and he stated the following: that McBride's high risk of recidivism did not mean that he was not amenable to treatment; that McBride was not psychologically or emotionally mature enough for adult court; that McBride's age indicated that his brain would continue to mature and develop, thus increasing his ability to apply treatment concepts successfully; and that McBride had accepted responsibility for his actions and had expressed genuine remorse and guilt.

**{¶34}** McBride spoke at the amenability hearing, stating that he had previously contained his emotions and tried to forget about them, which led to him expressing his emotions in unhealthy ways. He told the court that after he finished his earlier treatment, he felt that he needed additional treatment because his feelings had not improved or changed. According to McBride, he has realized that his prior treatment did not help him establish an understanding of why he acted the way he did. He apologized for his actions and asked for the chance to be treated in the juvenile system.

**{¶35}** The last witness to testify at the amenability hearing was Thomas Brock, a Hamilton County juvenile probation supervisor. Brock testified about the treatment program offered at the Village Network, which McBride successfully completed. He also discussed the sexual-offender treatment offered at other DYS facilities.

### C. The Juvenile Court's Amenability Determination

**{¶36}** The juvenile court issued an entry finding that McBride was not amenable to care or rehabilitation within the juvenile system and granting the state's motion for relinquishment of jurisdiction.

**{¶37}** In support of its decision to transfer jurisdiction, the court noted that McBride sexually assaulted four women, causing them both physical and psychological harm; that the victims of McBride's offenses were vulnerable due to their location and physical circumstances; that McBride had no relationship with any of the victims and targeted strangers, which elevated his risk for dangerousness and likelihood for reoffending; that McBride acted alone; that McBride's acts involved a concerning level of planning and organization and evidenced an escalation in conduct and violence; that McBride used a firearm in the commission of three of the offenses; that the offenses were committed contemporaneously with McBride's release from probation; that McBride had previously been adjudicated delinquent for gross sexual imposition and had completed intensive, residential sex-offender treatment followed by outpatient sex-offender treatment; that McBride continued to reoffend despite the existence of strong family support and successful completion of sex-offender treatment; that despite Leisgang's testimony to the contrary, the witness testimony and McBride's testing scores, including the manipulation of psychological testing to his benefit, demonstrated that he was mature enough for transfer; and that, as evidenced by McBride's serial sexual offending and minimization of his responsibility for his conduct, there was not sufficient time to rehabilitate McBride in the juvenile system without compromising public safety.

### D. Trial Court Proceedings

**{¶38}** Following the juvenile court's transfer of jurisdiction, McBride pled guilty to rape with an accompanying weapon specification, attempted rape, public indecency, and burglary. The trial court imposed an agreed sentence of 18 years of imprisonment.

**{¶39}** McBride now appeals.

### Challenges to R.C. 2152.12(B)

**{¶40}** In his first assignment of error, McBride raises several arguments concerning R.C. 2152.12(B), Ohio's discretionary-bindover statute.

**{¶41}** R.C. 2152.12(B) provides that:

Except as provided in division (A) of this section, after a complaint has been filed alleging that a child is a delinquent child for committing an act that would be a felony if committed by an adult, the juvenile court at a hearing may transfer the case if the court finds all of the following:

(1) The child was fourteen years of age or older at the time of the act charged.

(2) There is probable cause to believe that the child committed the act charged.

(3) The child is not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that the child be subject to adult sanctions. In making its decision under this division, the court shall consider whether the applicable factors under division (D) of this section indicating that the case should be transferred outweigh the applicable factors under division (E) of this section indicating that the case should not be transferred. The record shall

indicate the specific factors that were applicable and that the court weighed.

{¶42} McBride contends that the statute does not provide a standard of proof for the juvenile court to apply when determining under R.C. 2152.12(B)(3) whether a juvenile offender is amenable to care or rehabilitation in the juvenile system, and he urges this court to hold that a juvenile court's amenability determination must be supported by clear and convincing evidence. He additionally argues that R.C. 2152.12(B) is silent as to which party bears the burden of proof regarding a child's amenability to treatment in the juvenile system. On that point, he asks this court to hold that the state bears the burden of proving that a child is not amenable to treatment.

### A. No Waiver of Argument

{¶43} Before turning to the merits of McBride's arguments, we consider the state's assertion that McBride failed to preserve them for appellate review. The state argues that McBride failed to raise these arguments concerning R.C. 2152.12 below, and hence has waived them on appeal. The law is well settled that "[i]ssues not raised in the trial court may not be raised for the first time on appeal because they are deemed waived." *In re A.T.,* 1st Dist. Hamilton Nos. C-170467, C-170468 and C-170469, 2018-Ohio-2899, ¶ 12.

{¶44} During closing arguments at the amenability hearing, McBride argued that "We do object for the record to the plain language of Revised Code 2152.12 in regards to the factors, that they require essentially a presumption of guilt prior to any adjudication or finding of guilt. We also object to any counting or calculating of factors as it violates David's right to fundamental fairness." While McBride did not phrase his argument below in the precise manner that he has on appeal, we hold that his

contentions were sufficient to preserve his arguments concerning R.C. 2152.12 for appellate review.

### B. An Amenability Determination Must be Supported by a Preponderance of the Evidence

**{¶45}** We first consider McBride's argument that a juvenile court's amenability determination under R.C. 2152.12(B)(3) must be supported by clear and convincing evidence.

**{¶46}** The Supreme Court of Ohio recently considered—and rejected—this same argument in *Nicholas*, Slip Opinion No. 2022-Ohio-4276. In holding that a juvenile court's amenability determination under R.C. 2152.12(B)(3) must be supported by a preponderance of the evidence, the court held that:

> R.C. 2152.12(B)(3) requires a juvenile court to weigh the factors in R.C. 2152.12(D) in favor of transfer against the factors in R.C. 2152.12(E) against transfer. To find that a juvenile is not amenable to treatment in the juvenile system, the court need only conclude that the factors that favor transfer outweigh the factors that counsel against transfer. By requiring only a simple outweighing, R.C. 2152.12(B) by its terms establishes a preponderance-of-the-evidence standard for deciding a juvenile's amenability.
>
> *      *      *
>
> This holding comports with other decisions of this court. For example, in determining that the standard of proof under R.C. 2305.02, a wrongful-conviction statute, was "the usual preponderance of the evidence standard," this court wrote, "The General Assembly, had it wanted to do so, knew how to specify a 'clear and convincing standard.' " *Walden v. State*, 47 Ohio St.3d 47, 53, 547 N.E.2d 962 (1989). The

Revised Code contains many statutes that expressly impose a clear-and-convincing-evidence standard of proof. *See, e.g.,* R.C. 2152.14(E) (requiring findings by clear and convincing evidence to invoke the adult portion of a serious-youthful-offender disposition); R.C. 5120.17(B)(4) (requiring clear and convincing evidence of an inmate's mental illness to transfer the inmate to a psychiatric hospital); R.C. 2151.414(B)(1) (requiring clear and convincing evidence that it is in a child's best interest to grant permanent custody of the child to a public children-services agency or private child-placing agency). R.C. 2152.12(B)(3) contains no such language. Rather, the statutory language is wholly consistent with a preponderance-of-the-evidence standard of proof.

*Id.* at ¶ 29 and 30.

{¶47} The court additionally considered Nicholas's argument that, regardless of the clear statutory language, the constitutional guarantee of due process requires use of a clear-and-convincing standard to determine a juvenile's amenability to rehabilitation in the juvenile system. *Id.* at ¶ 31. In rejecting that argument, the court first noted that "The United States Supreme Court has held that a preponderance-of-the-evidence standard is inadequate to satisfy due-process requirements in certain types of cases." *Id.* at ¶ 33. It referenced a few such types of cases, including a civil state-law proceeding for the involuntary commitment of an individual to a mental hospital. The court then recognized that the high court had never set forth a similar requirement in situations involving the transfer of jurisdiction from a juvenile court to an adult court, stating:

The United States Supreme Court "has never attempted to prescribe criteria for, or the nature and quantum of evidence that must support, a decision to transfer a juvenile for trial in adult court." *Breed v. Jones*, 421 U.S. 519, 537, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975). For purposes of

transferring a case from juvenile court to adult court, the Supreme Court has held, albeit without specifically addressing the required standard of proof, that the requirements of due process are satisfied when a juvenile court issues a decision stating its reasons for the transfer after first conducting a hearing at which the juvenile is represented by counsel. *Kent [v. United States]*, 383 U.S. [541,] at 557, 86 S.Ct. 1045, 16 L.Ed.2d 84 [(1966)]. And federal circuit courts have gone further, expressly holding that the Due Process Clause of the United States Constitution does not require a clear-and-convincing-evidence standard with respect to juvenile-transfer decisions. *See, e.g.*, *United States v. Juvenile Male*, 554 F.3d 456, 460 (4th Cir.2009); *United States v. Doe*, 49 F.3d 859, 868 (2d Cir.1995); *United States v. T.F.F.*, 55 F.3d 1118, 1122 (6th Cir.1995); *United States v. A.R.*, 38 F.3d 699, 703 (3d Cir.1994); *United States v. Parker*, 956 F.2d 169, 171 (8th Cir.1992); *United States v. Brandon P.*, 387 F.3d 969, 976-977 (9th Cir.2004). We agree with those courts.

*Id*. at ¶ 34.

**{¶48}** We follow *Nicholas* and hold that a juvenile court's amenability determination under R.C. 2152.12(B)(3) must be supported by a preponderance of the evidence and not clear and convincing evidence.

### D. Burden of Proof

**{¶49}** We now turn to McBride's argument that the state bears the burden of proving pursuant to R.C. 2152.12(B)(3) that a child is not amenable to rehabilitation in the juvenile system. The Supreme Court of Ohio also considered this same argument in *Nicholas*.

**{¶50}** The *Nicholas* court first explained that the term "burden of proof" encompassed two different aspects of proof, the burden of production and the burden of persuasion. *Nicholas*, Slip Opinion No. 2022-Ohio-4276, at ¶ 25. It elucidated the difference between these two concepts, stating:

> The party having the burden of production on a particular issue will lose on that issue as a matter of law if the party does not produce evidence sufficient to make out a case for the trier of fact. *State v. Robinson*, 47 Ohio St.2d 103, 107, 351 N.E.2d 88 (1976). The burden of persuasion, on the other hand, "refers to the risk which is borne by a party if the [trier of fact] finds that the evidence is in equilibrium." *Id.* "The party with the burden of persuasion will lose if he fails to persuade the trier of fact that the alleged fact is true by such quantum of evidence as the law demands." *Id.*

*Id.*

**{¶51}** While acknowledging that the party who files a motion typically bears the burden of production with respect to the motion, the *Nicholas* court recognized that the discretionary-transfer statute presented somewhat of a unique situation because the statutory language required the juvenile court itself to order an investigation before considering whether transfer to adult court was appropriate. *Id.* at ¶ 26. In so concluding, it relied on the language of R.C. 2152.12(C), which provides that when considering a discretionary transfer under R.C. 2152.12(B), the court "shall order an investigation into the child's social history, education, family situation, and any other factor bearing on whether the child is amenable to juvenile rehabilitation, including a mental examination of the child by a public or private agency or a person qualified to make the examination." R.C. 2152.12(C).

**{¶52}** The *Nicholas* court held that while the statute did not preclude the parties from producing additional evidence regarding the child's amenability, "it is

evident from R.C. 2152.12 that the General Assembly did not intend to preclude discretionary transfer based on the state's failure to produce affirmative evidence of nonamenability." *Nicholas* at ¶ 26. It further held that while the state did not bear the burden of production, it did bear the ultimate burden of persuasion to convince the juvenile court to transfer a child's case to adult court. *Id.* at ¶ 27.

{¶53} Following *Nicholas*, we reject McBride's argument that the state should be required to bear the burden of proving that a child is not amenable to rehabilitation in the juvenile system and hold that "while the state bears the ultimate burden of persuasion on the question of a juvenile's nonamenability to treatment and rehabilitation in the juvenile system, the state need not produce affirmative evidence of nonamenability." *Id.* at ¶ 57.

{¶54} McBride's first assignment of error is accordingly overruled.

### *No Abuse of Discretion in Transfer of Jurisdiction*

{¶55} In his second assignment of error, McBride argues that the juvenile court abused its discretion when it found that he was not amenable to rehabilitation in the juvenile system and transferred his case to adult court for criminal prosecution.

{¶56} As set forth above, R.C. 2152.12(B) provides that the juvenile court may transfer a child's case to adult court if it finds that the child was at least 14 years old at the time the offense was committed, there existed probable cause that the child committed the charged offenses and that the child was not amenable to care or rehabilitation in the juvenile system. In making the required amenability determination, the juvenile court shall consider "whether the applicable factors under division (D) of [R.C. 2152.12] indicating that the case should be transferred outweigh the applicable factors under division (E) of [R.C. 2152.12] indicating that the case should not be transferred." R.C. 2152.12(B)(3). The juvenile court record "must

'indicate the specific factors that were applicable and that the court weighed.' " *State v. Marshall*, 1st Dist. Hamilton No. C-150383, 2016-Ohio-3184, ¶ 14, quoting R.C. 2152.12(B)(3).

{¶57} As correctly identified by McBride, we review a juvenile court's amenability determination for an abuse of discretion. *Id.* at ¶ 15. We stated in *Marshall* that:

> R.C. 2152.12 is silent with regard to how a juvenile court should weigh the factors in R.C. 2152.12(D) and (E). Thus, the juvenile court has the discretion to determine how much weight should be accorded to any given factor. *See State v. Morgan*, 10th Dist. Franklin No. 13AP-620, 2014-Ohio-5661, ¶ 37. "As long as the court considers the appropriate statutory factors and there is some rational basis in the record to support the court's findings when applying those factors, [this court] cannot conclude that the trial court abused its discretion in deciding whether to transfer jurisdiction." *State v. West*, 167 Ohio App.3d 598, 2006-Ohio-3518, 856 N.E.2d 285, ¶ 10 (4th Dist.).

*Id.*; *see State v. Ramsden*, 12th Dist. Clinton No. CA2020-11-016, 2021-Ohio-3071, ¶ 23. An abuse of discretion indicates "more than a mere error of law or judgment; it implies that the trial court's decision was unreasonable, arbitrary, or unconscionable." *State v. Griffin*, 2020-Ohio-3707, 155 N.E.3d 1028, ¶ 38 (1st Dist.).

{¶58} In determining that McBride was not amenable to rehabilitation in the juvenile system, the juvenile court considered the factors in R.C. 2152.12(D) and (E) weighing in favor of and against transfer. In its entry relinquishing and transferring jurisdiction, the court specifically discussed its findings with respect to each factor. The court's reasons in support of its decision to transfer jurisdiction are set forth in detail above.

{¶59} McBride specifically contends that the court abused its discretion by ignoring two expert reports stating that he was amenable to rehabilitation in the juvenile system. "[A] juvenile court in making an amenability determination is entitled to disagree with the opinion of a medical expert and may take into account the severity of the offenses when considering whether a juvenile is mature enough for transfer and whether enough time exists to rehabilitate in the juvenile-justice system." *Marshall,* 1st Dist. Hamilton No. C-150383, 2016-Ohio-3184, at ¶ 21. But while a trial court is not required to automatically accept an expert opinion, the court may not arbitrarily disregard the opinion of the expert and must provide an objective reason for ignoring it. *State v. White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905, ¶ 71; *State v. Weaver*, Slip Opinion No. 2022-Ohio-4371, ¶ 33.

{¶60} Both Leisgang and Rothenberg opined that McBride was amenable to rehabilitation in the juvenile system. The juvenile court acknowledged and considered their opinions in its entry. In rejecting the experts' opinions that McBride was not emotionally, physically, or psychologically mature enough for transfer, the juvenile court stated:

> Dr. Leisgang testified that in her professional opinion, the Defendant was not emotionally mature enough for a transfer to adult court. Although the doctor opined this position in court, the written report is virtually silent on whether the Defendant's emotional functioning falls below his chronological age. The Court notes that the witness testimony and the Defendant's testing scores show that he is in fact, mature. The Defendant was given an RSTI Interview and received high scores on his Sophistication and Maturity. This scale is comprised of three clusters including autonomy, cognitive capacities, and emotional maturity. Dr. Leisgang further noted that the Defendant's test scores on this scale were suggestive of anti-social behavior. Additionally, testimony

21

presented during the trial portrayed the Defendant as a contemplative, intelligent, and mature individual who adapted to different situations and easily assumed leadership roles.

Finally, the Court notes a level of maturity and sophistication in that the Defendant tends to manipulate psychological testing to his benefit. Each professional that interviewed the Defendant makes note that he emphasizes his perceived weaknesses or struggles and minimizes his abilities. The Court finds that the Defendant attempted to skew testing results in the Defendant's favor and minimize his culpability in the offenses. Evidence was presented that established that the Defendant is emotionally, physically, and psychologically mature.

\* \* \*

As discussed above, the Defendant has shown that he is a mature and high functioning individual as evidenced by his sophisticated and calculated planning when committing these acts. The Court does take the Defendant's age into account, and looked very closely at the testimony of Dr. Leisgang and Dr. Rothenberg in their explanation of the development of a child's brain and the maturity of any 15 year old. However, the Court finds that sufficient evidence was presented to establish the Defendant is in fact emotionally, physically and psychologically mature enough for a transfer.

{¶61} As evidenced by these statements, the juvenile court provided an objective reason for disregarding the experts' opinions that McBride was not mature enough for a transfer. The juvenile court relied on the results of the psychological test administered by Leisgang, as well as the experts' own testimony that the test results indicated that McBride attempted to highlight his weakness and reflected an element of exaggeration in his complaints and problems. The testimony of Goodrum,

McBride's own witness, supported the juvenile court's statements about McBride's maturity and leadership skills.

{¶62} McBride additionally argues that the juvenile court erroneously disregarded the experts' testimony that there was sufficient time to rehabilitate him in the juvenile system. His argument concerns the juvenile court's finding under the factor in favor of transfer set forth in R.C. 2152.12(D)(9), which states, "There is not sufficient time to rehabilitate the child within the juvenile system." It also concerns the factor against transfer set forth in R.C. 2152.12(E)(8), which states, "There is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety."

{¶63} In rejecting the experts' opinions and finding that there was not sufficient time to rehabilitate McBride, the juvenile court stated:

> According to the evidence presented, the Defendant received intensive residential and outpatient therapy and rehabilitation services. The evidence is uncontroverted that the Defendant is at an extremely high risk for reoffending, and presents as an extremely dangerous offender. He continued to engage in inappropriate sexually deviant behaviors, minimized his responsibility for this conduct and displayed limited insight into the dynamics behind his sexually offending behavior. More problematic is that the Defendant's serial sexual offending is accelerating in frequency and aggression with the most recent rape charges that were perpetrated with a firearm. Based on the record before the Court, the evidence is compelling that the Defendant cannot be rehabilitated in the time remaining within the juvenile system without compromising public safety.

* * *

23

The evidence is overwhelming and uncontroverted that the Defendant's treatment needs are significant and complex requiring lengthy and protracted interventions to address his higher risk for reoffending. Based upon the record and considering the time remaining under the jurisdiction of the Juvenile Court, the Defendant poses an unacceptably high risk for serious reoffending. The risk and danger to the community is too great and the risk of reoffending is too high for the Defendant to be rehabilitated within the juvenile court.

**{¶64}** The juvenile court again provided objective reasons for disregarding the experts' opinions on these factors. The record clearly contains support for the juvenile court's concerns for public safety and the escalating violence involved in McBride's offenses. And further support for the juvenile court's determination that there does not exist sufficient time to rehabilitate McBride in the juvenile system can be found in Rothenberg's report, which cautioned that "the nature of some of [McBride's] problems suggest that treatment would be fairly challenging with a difficult treatment process and the probability of reversals."

**{¶65}** McBride also contends that the juvenile court improperly relied on his previous adjudication and sexual-offender treatment to find that he cannot be rehabilitated in the juvenile system. On this point, the juvenile court stated that:

The new offenses were committed contemporaneously with the Defendant's release from probation. According to the evidence presented, an administrative entry dated 07/19/18 terminated the Defendant from official probation, which is the same date as three of the four sexual assaults. Non-reporting probation remained in effect until the Defendant's 21st birthday. The Defendant may not have been aware of his termination from probation. This leaves the Court with two conclusions. Either the Defendant was aware that his probation had

24

ended and committed these violent sexual offenses, or in the alternative, the Defendant was not aware that his probation had ended and he committed these violent and severe sexual acts while on probation. In either scenario, these multiple sexual offenses represent a severe escalation from his prior history of sexual offending behavior that included a 2016 adjudication of delinquency for Gross Sexual Imposition.

**{¶66}** McBride's commission of multiple new offenses on the date that he was released from probation was an appropriate factor for the court to consider. *See* R.C. 2152.12(D)(6) (the juvenile court shall consider whether "[a]t the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction."). The juvenile court's consideration of McBride's prior treatment in juvenile court was also appropriate. *See* R.C. 2142.12(D)(7) (the juvenile court shall consider whether "[t]he results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.").

**{¶67}** As McBride correctly asserts, the record contained testimony about whether the sexual-offender treatment that he received for his 2016 adjudication would be the same treatment that he would receive if he was rehabilitated for the current offenses in the juvenile system. But the record does not indicate that the juvenile court based its decision to transfer jurisdiction on the lack of available treatment in juvenile court, which would have been improper. As the Supreme Court of Ohio recently held in *Nicholas*, Slip Opinion No. 2022-Ohio-4276, at ¶ 55, "[t]he conflation of the distinct issues of amenability and available services is especially inappropriate in Ohio because R.C. Chapter 2152 does not limit a juvenile court's dispositional options to DYS commitment should the juvenile court retain

25

jurisdiction," and consequently a juvenile court "may not base a decision to transfer a child to adult court on a perceived lack of DYS resources when the General Assembly has made available other options should the need for those additional resources arise."

**{¶68}** While the juvenile court recognized that McBride had previously received sexual-offender treatment in juvenile court, it notably did not base its decision to transfer jurisdiction on a lack of available services in juvenile court. When considering R.C. 2152.12(D)(7), the court stated:

As a result of this adjudication [for gross sexual imposition] and the recommendations from the Risk Assessment and Psychological Evaluation by Dr. Dreyer, the Defendant completed intensive, residential sex offender treatment and rehabilitation services at The Village Network followed by outpatient sex offender treatment at the Talbert House Safeguard Program. In these programs, the Defendant received age appropriate Individual Therapy, Group Therapy, Family Therapy, and Cognitive Behavioral Therapy (CBT) which included the Pathways Treatment curriculum, a juvenile sex offender specific therapy. The Defendant also received trauma informed treatment, art therapy, music therapy, as well as therapy for emotional regulation, anger management, empathy development, relationship issues, anxiety and impulse management, social and coping skills, trauma recovery, thinking errors and relapse prevention. The Defendant received medication and med-somatic services. Finally, the Defendant developed relapse prevention plans in each of his programs.

The Defendant had strong family support, structure and nurturance from his mother and from positive adult role models in the community. Despite the existence of strong family and community connections coupled with the benefits that should have been associated with

26

successful completion of intensive, age appropriate and sex offender specific treatment, the Defendant continued to reoffend and escalate his behaviors in an extreme and rapid fashion.

{¶69} Following our review of the record, we find no abuse of discretion in the juvenile court's determination that McBride was not amenable to rehabilitation in the juvenile system. We do not take lightly the impact of a transfer of jurisdiction on a juvenile. But in this case, the record clearly reflects that the juvenile court considered the appropriate statutory factors, and it contains a rational basis to support the juvenile court's findings with respect to those factors. *See Marshall*, 1st Dist. Hamilton No. C-150383, 2016-Ohio-3184, at ¶ 15. The juvenile court issued a well-thought-out and thorough decision and did not act unreasonably, arbitrarily, or unconscionably in finding that McBride was not amenable to rehabilitation in the juvenile system.

{¶70} McBride's second assignment of error is overruled.

### *Conclusion*

{¶71} For the reasons set forth in this opinion, we hold that a juvenile court's amenability determination under R.C. 2152.12(B)(3) must be supported by a preponderance of the evidence, and that while the state is not required to produce affirmative evidence of nonamenability, it does bear the ultimate burden of persuasion on the question of a juvenile's amenability to rehabilitation in the juvenile system. We further hold that the juvenile court did not abuse its discretion in determining that McBride was not amenable to rehabilitation in the juvenile system, and we affirm the trial court's judgment.

Judgment affirmed.

**BERGERON, J.,** concurs in judgment only.
**CROUSE, J.,** concurs in part and dissents in part.

CROUSE, J., concurring in part and dissenting in part.

{¶72} I concur with the lead opinion's holding regarding the preponderance-of-the-evidence standard and the burden of proof because those issues were recently conclusively decided by the Supreme Court of Ohio in *State v. Nicholas*, Slip Opinion No. 2022-Ohio-4276. However, because I believe that the juvenile court abused its discretion in granting the state's motion for relinquishment of jurisdiction, I must respectfully dissent from that portion of the lead opinion.

{¶73} Pursuant to the *Nicholas* case, the prosecution has the "burden of persuasion" in an amenability hearing. *Nicholas* at ¶ 27. Furthermore, in deciding whether a juvenile should be transferred to the adult system, the court "need only conclude that the factors that favor transfer outweigh the factors that counsel against transfer," which is a preponderance-of-the-evidence standard. *Id.* at ¶ 29. " '[A] preponderance of evidence means the greater weight of evidence. * * * The greater weight may be infinitesimal, and it is only necessary that it be sufficient to destroy the equilibrium.' " (Citations omitted.) *Id.*

{¶74} Our review of the juvenile court's decision is for an abuse of discretion. Thus, in order to reverse a juvenile court's decision to transfer a juvenile to the adult system, this court must find that the juvenile court abused its discretion by finding that a preponderance of the evidence weighed in favor of a transfer. After a thorough review of the record, I would hold that the juvenile court abused its discretion.

{¶75} What is so concerning to me about this case, is that two experts–one appointed by the court and one hired by the defense–testified that they believed McBride was amenable to treatment in the juvenile system. Both testified that although McBride had previously received treatment in the system for a prior offense, this treatment was not long enough because it was only for a year, not individualized, and did not include an appropriate release prevention plan. Both experts believed that McBride required much longer, age-appropriate, and more regular, individualized

treatment. Both experts opined that DYS could adequately deliver such treatment during the five years McBride had left in the juvenile system. There was no evidence presented that DYS could not provide McBride with this type of treatment.

**{¶76}** The experts explained that even though McBride was at a high risk for reoffending, this does not equate to lack of amenability. Both experts explained that McBride was interested in treatment, had treatable mental-health issues, accepted responsibility and was remorseful for what he had done, and had the support of his family. Both experts explained that a juvenile's brain is malleable, which makes him more receptive to treatment and rehabilitation. Both agreed that as McBride ages, his impulse control will improve, and he will be able to better apply the treatment concepts.

**{¶77}** Dr. Leisgang, the court-appointed expert, testified:

There are rare instances of a 15-year-old who presents with such glibness, such psychopathy, which even is amenable within juveniles – * * * – there's no interest in treatment that, yes, there is the possibility that that 15-year-old – it would be a recommendation of transfer.

But in general, it's kind of – the point of Juvenile Court is to rehabilitate based on the malleable function of the brain.

**{¶78}** Dr. Leisgang explained that for the safety of the community, McBride needed to be in a structured environment for five years. When asked by the prosecutor if "this is basically saying lock him up for five years either way," Dr. Leisgang responded, "Well, DYS is actually a more protective factor than prison."[2] Dr. Leisgang

---

[2] In this context, a "protective factor" refers to a "characteristic at the biological, psychological, family, or community (including peers and culture) level that is associated with a lower likelihood of problem outcomes or that reduces the negative impact of a risk factor on problem outcomes." O'Connell, Boat & Warner, *Preventing Mental, Emotional, and Behavioral Disorders Among Young People: Progress and Possibilities* (2009), https://www.ncbi.nlm.nih.gov/books/n/nap12480/pdf/ (accessed Dec. 28, 2022).

referred to studies that have established that the recidivism for transferred youth is significantly higher than nontransferred youth.

**{¶79}** Furthermore, both experts opined that McBride was not psychologically or emotionally mature enough to be transferred into the adult system. Dr. Rothenberg, the defense expert, explained that even though McBride was almost 16 years old, he was functioning emotionally and psychologically at a much lower level.

**{¶80}** The juvenile court disregarded this compelling and uncontroverted testimony.

**{¶81}** The lead opinion correctly notes that a court may disagree with expert opinions. However, a court may not arbitrarily disagree with or ignore expert opinions, which is what I believe the juvenile court did in this case.

**{¶82}** An "expert opinion 'may not be *arbitrarily* ignored, and some reason must be objectively present for ignoring expert opinion testimony.' " (Emphasis sic.) *State v. White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905, ¶ 71, quoting *United States v. Hall*, 583 F.2d 1288, 1294 (5th Cir.1978). The trial court must "set forth [some] rational basis grounded in the evidence for rejecting the uncontradicted testimony of two qualified experts in the field of psychology." *Id*. at ¶ 70; *see Weaver*, Slip Opinion No. 2022-Ohio-4371, at ¶ 33.

**{¶83}** I disagree with the lead opinion that the trial court based its disregard for the expert's opinions on objective evidence. Rather, it appears that the trial court merely substituted its own assessment of McBride for that of the experts. "While the trial court is the trier of fact, it may not disregard credible and uncontradicted expert testimony in favor of either the perceptions of lay witnesses or of the court's own expectations of how [the defendant] would behave. Doing so shows an arbitrary, unreasonable attitude toward the evidence before the court and constitutes an abuse of discretion." *White* at ¶ 74.

**{¶84}** The trial court did not make any findings that the expert witnesses appearing before it lacked either credentials or credibility. Rather, the court found that despite Dr. Leisgang's testimony to the contrary, McBride's testing scores and "the witness testimony" showed that he was "emotionally, physically, and psychologically mature" enough for a transfer.

**{¶85}** The Sophistication/Maturity Scale referenced in Dr. Leisgang's report and relied upon by the trial judge to come to his determination that McBride was mature enough for a transfer, stated that McBride's score "fell in the high range and is suggestive of anti-social behavior." It went on to state that "[r]isk factors include past/current negative self-concept, problems delaying gratification, poor emotional regulation and limited interpersonal skills." The trial judge correctly noted that the report was silent on whether he was mature enough for a transfer to adult court, but the court, on its own, interpreted McBride's scores in this area to mean that he was. This is despite the fact that Dr. Leisgang testified that he was not.

**{¶86}** The trial judge also completely ignored the testimony of Dr. Rothenberg that McBride was not emotionally, physically, or psychologically mature enough for a transfer. It is an abuse of discretion for a court to completely disregard expert testimony, especially when it has not made a finding that the expert lacked credentials or credibility.

**{¶87}** The witness testimony the court relied on to support its rejection of the expert testimony on lack of maturity was from Gregory Goodrum. Goodrum was a mentor to McBride from age six until McBride moved to Indiana to live with his father, sometime around the time that McBride entered puberty. While Goodrum did testify that McBride was diligent and smart and exhibited leadership skills when he was younger, he also testified that he noticed a change in him when his mother and stepfather got together and he went through puberty. Goodrum testified that McBride

began struggling and not doing very well. Certainly, such testimony cannot be construed to mean that McBride was mature enough for a transfer. Even if Goodrum's testimony could be so construed, a trial court may not disregard credible and uncontradicted expert testimony in favor of the perceptions of lay witnesses. Goodrum's testimony is not an objective reason for ignoring two expert opinions to the contrary.

{¶88} While the court was free to take into consideration McBride's high risk of reoffending and concerns for public safety, those issues were addressed by both expert witnesses, who testified that this does not equate to lack of amenability. The court reasoned that because McBride previously was provided with one year of sex-offender treatment by DYS, additional treatment for five years in DYS would not help, despite the experts' extensive testimony to the contrary. It did not base its rejection of the expert testimony on any objective reason other than the court's belief that because treatment in the juvenile system did not work before, then it most likely would not work again.

{¶89} If the legislature had intended past failure of treatment to be dispositive, then it could have required transfer of all repeat offenders. Instead, the legislature required an individual assessment of rehabilitation potential. The experts opined that such potential existed, and the court disregarded the opinions without a basis in evidence, other than the mere fact of lack of prior success and the severity of the current charges.

{¶90} The court further found that McBride "has no signs of * * * serious mental illness." First, R.C. 2152.12(E)(7) states that a factor weighing against a transfer is that "[t]he child has a *mental* illness," not a *serious* mental illness. Second, the court acknowledged that McBride "has been diagnosed with Exhibitionistic Disorder, Paraphilic Disorder and Major Depressive Disorder with Anxiety." Nevertheless, the

court seemed to discount these diagnoses because it believed McBride may have been exaggerating or feigning his symptoms due to comments made in a competency evaluation by a different expert witness who did not testify at the hearing. Both experts who did testify were questioned extensively about whether they believed McBride was malingering, and each responded that in his or her expert opinion he was not. In fact, Dr. Rothenberg testified that he interpreted McBride's exaggeration "more as a sign of distress than any kind of malingering or feigning of symptoms."

**{¶91}** It is clear to me that the heinous facts of this case clouded the court's judgment, leading it to conclude that this child was not worthy of any further attempts at rehabilitation and instead deserved to be warehoused in an adult prison. In fact, the court wrote in its findings of fact and conclusions of law that "[t]his is a unique case, and the most grave and extreme case the Court has seen involving a juvenile sex offender." But case facts should be considered to determine whether the juvenile is amenable to treatment in the juvenile system and not whether the juvenile should be punished in the adult system. As stated by the Supreme Court of the United States, "*Roper* and *Graham* emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. Because " '[t]he heart of the retribution rationale' " relates to an offender's blameworthiness, " 'the case for retribution is not as strong with a minor as with an adult.' " *Miller v. Alabama*, 567 U.S. 460, 472, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), quoting *Graham v. Florida*, 560 U.S. 48, 71, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), quoting *Tison v. Arizona*, 481 U.S. 137, 149, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), and *Roper v. Simmons*, 543 U.S. 551, 571, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005).

**{¶92}** Because the juvenile court's decision was unreasonable, arbitrary, and unconscionable in that it completely disregarded the uncontroverted testimony of two experts without any rational basis grounded in the evidence, I would hold that the

court abused its discretion in requiring that McBride be transferred to the adult system to face adult sanctions. Accordingly, I respectfully dissent from the portion of the lead opinion that holds otherwise.

Please note:

The court has recorded its own entry on the date of the release of this opinion.